546 So.2d 371 (1989)
CENTRAL ALABAMA ELECTRIC COOPERATIVE
v.
Janice C. TAPLEY.
87-1188.
Supreme Court of Alabama.
May 12, 1989.
*373 William P. Cobb II and Patricia A. Hamilton of Balch & Bingham, Montgomery, for appellant.
Randall S. Hayes and Larry W. Morris of Radney & Morris, Alexander City, for appellee.
PER CURIAM.
Central Alabama Electric Cooperative ("CAEC"), a cooperative non-profit membership corporation, appeals from a judgment against it on a general jury verdict in a wrongful death case. Janice C. Tapley sued as a result of the electrocution of her husband, Wendall M. Tapley. This action was brought pursuant to Alabama Code 1975, § 25-5-11(a), which gives to dependents of an employee, killed under circumstances that might create liability on the part of a third party, the right to commence an action against that third party. CAEC filed motions for a directed verdict on the issues of negligence, wantonness, and Tapley's contributory negligence. The trial court denied these motions, and the case was submitted to the jury. After the jury returned a verdict in the amount of $1 million, CAEC filed a motion for a judgment notwithstanding the verdict on the issues of negligence, wantonness, and Tapley's contributory negligence. This motion, too, was denied.
Tapley, a truck driver employed by Diversified Support Services to haul asphalt and related materials to and from an asphalt plant, was killed when he raised the "trailer dump" of his tractor-trailer rig into an uninsulated electric distribution line ("line") owned by CAEC. Tapley was called to work, unexpectedly, around 6:00 o'clock on the morning of his death. Around 7:45 A.M. that morning, Tapley was attempting to clean water, dirt, and other debris from his trailer dump prior to taking on a load of asphalt. He positioned the rig underneath the line, raised the trailer dump into the line, and, while standing on the wet, muddy ground beside the truck, apparently reached back into the cab and contacted the dump control switch, apparently attempting to raise or lower the trailer dump.
The line with which Tapley's trailer dump came in contact had been erected by CAEC within a week of Tapley's death, pursuant to a request by Pee Wee Ingram, one of the owners of the asphalt plant. Hampton Holman, CAEC's district manager, and Lewis Reynolds, CAEC's lead lineman, met with Ingram prior to construction of the line to discuss the type of electrical service needed and the location of the line necessary to provide that service. The CAEC representatives saw trailer dumps similar to the one operated by Tapley, as well as other equipment, at the asphalt site. CAEC looked at several alternative routes by which to string the line to supply electrical power so that the line could go to a switchbox already in place next to the asphalt *374 plant, as Ingram had requested. While discussing the possibility of stringing the line across the areas of stockpiling (which areas required the use of trailer dumps in an upright position), Ingram stepped off the length of a trailer dump and told CAEC's representatives that the trailer, including the height of the bed and tarpaulin rack, would be between 35 and 36 feet, if it could have been raised absolutely perpendicularly. Using this information, CAEC determined that it could not string the line across areas of stockpiling, where dumping was obviously taking place. Ingram agreed with this and with CAEC's determination to string the line across the roadway to the asphalt plant.
There was no designated area for drivers to clean out their trailer dumps prior to taking on a load of asphalt. Viewing the evidence most favorably to Tapley, we find that the area where Tapley was attempting to clean out his trailer dump at the time of his death was the firmest and, thus, appeared to be the safest area. There was also other evidence that showed that there were several other areas away from the line, with no overhead obstructions, where Tapley could have cleaned out his trailer dumpfor example, the roadway, from the entrance gate toward an incline, along which trailers were parked from time to time; a large area on a hill, where trailers were placed from time to time; and another area where trailers were parked in which crushed rock had been placed.
The roadway on which the accident occurred runs east to west, between a quarry operation on the south side and the asphalt operation on the north side. Over CAEC's objection, the trial court allowed evidence that eight to nine years earlier, for a different company, CAEC had placed three orange markers or balls on a separate power line that runs parallel to the left of the roadway in the quarry area. There were no other orange balls or any warning devices placed anywhere else in the area, and there were other electric lines that crossed the roadway into the plant on which no orange balls were placed. It is undisputed that CAEC was told by Ingram, prior to the erection of the line involved in this action, that there would be no stockpiling or placing of anything else on the ground in the area chosen for service. In addition, and again over CAEC's objection, the trial court allowed evidence of CAEC's placement of orange balls and ribbons, subsequent to the accident, upon the line that Tapley contacted, as well as Holman's testimony that he had intended to place an orange ball over the roadway (even though Ingram had told him there would be no dumping), but that he did not have any in stock. Reynolds testified that at the time he constructed the line "he didn't see any reason to put a ball there," because he was told that there would not be unloading or dumping along this roadway.
It is undisputed that the height of the line was 6½ to 8 feet above the National Electrical Safety Code ("NESC") minimum requirement. However, Tapley's expert testified that the height of the line was in violation of the NESC, because the "given local conditions were not considered," and, he said, "local conditions" means that "you should take into consideration everything that's possible to take into consideration to preserve the safety of the lines."
With that brief factual background, we proceed to consider all seven issues raised by CAEC. We, of course, will develop the facts more fully as the resolution of each issue requires.

I.
The first issue CAEC raises is the constitutional validity of Code 1975, § 6-5-410, the Alabama wrongful death statute, under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States.[1] The primary attack pressed by CAEC is that, under Alabama's unique wrongful death statute, it is fundamentally unfair 1) for juries to award punitive damages for, in some cases, including *375 this one, simple negligence (or misconduct less than intentional misconduct), and 2) to permit juries to assess punitive damages without standards to guide the determination of an appropriate amount.

A. Fourth, Fifth, and Sixth Amendments

We will not analyze the appellant's contention that § 6-5-410, or an award of punitive damages generally, implicates the Fourth, Fifth, and Sixth Amendments, for it has not identified what specific rights it feels have been violated. Moreover, CAEC has made no specific arguments under either amendment, and this Court will not speculate or search for a particular basis for a constitutional challenge. See A.R. App.P. 28(a)(5); see also Henderson v. Alabama A & M Univ., 483 So.2d 392 (Ala. 1986). To the extent that CAEC alleges a violation of its rights to due process of the law, we address that argument under our treatment of the Fourteenth Amendment, infra. Any other Fourth, Fifth, or Sixth Amendment issue is waived under state procedural law, because CAEC has neither specifically argued nor specifically identified any other particular right.

B. Eighth Amendment

CAEC next maintains that the fact that our wrongful death statute mandates punitive damages requires us to analyze the "excessive fines" clause of the Eighth Amendment. A majority of this Court squarely rejected that very argument in Industrial Chem. & Fiberglass Corp. v. Chandler, 812 So.2d 547 (Ala.1989). In Industrial Chemical, we relied heavily on Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). As the Court in Ingraham noted, the provisions of the Eighth Amendment may apply to punishments that, although not strictly criminal, are quasi-criminal in nature. Ingraham, 430 U.S. at 669 n. 37, 97 S.Ct. at 1411 n. 37. We refuse to reason, however, that, because the "excessive fines" clause may apply to quasi-criminal sanctions, such sanctions include those that involve allegedly excessive civil jury verdicts. Such circular reasoning would make little sense and bad law. Consequently, on the authority of Industrial Chemical, we reject the argument that the judgment in this case implicates the Eighth Amendment.

C. Fourteenth Amendment

CAEC's final constitutional argument is that it has been denied its rights to procedural and substantive due process under the Fourteenth Amendment by the judgment below.
1. Procedural due process
We find that the procedural due process issue has not been adequately preserved for our review, due to noncompliance with fundamental concepts of issue preservation under state law. As we stated in Bevill v. Owen, 364 So.2d 1201, 1203 (Ala.1979):
"It is a fundamental rule of appellate procedure that, regardless of [the] merits of [an] appellant's contentions, appellate courts will not review questions not decided by the trial court. McWhorter v. Clark, 342 So.2d 903 (Ala.1977). The Supreme Court cannot put a trial court in error for failure to rule on a matter which, according to the record, was not presented to nor decided by it. Defore v. Bourjois, Inc., 268 Ala. 228, 105 So.2d 846 (1958)."
CAEC's procedural due process argument essentially progresses on three tracks. First, it argues that defendants subject to the imposition of punitive damages are entitled to the protection of a bifurcated trial. In the case at bar, CAEC made no motion to bifurcate the trial, and we will not hold the trial court in error for not bifurcating the trial on its own motion. See Coburn v. American Liberty Ins. Co., 341 So.2d 717 (Ala.1977); A.R.Civ.P. 42(b).
The second procedural due process issue raised by CAEC is the failure of the trial court to charge the jury that clear and convincing evidence is necessary to support any assessment of punitive damages.
"No party may assign as error the giving or failing to give a written instruction, or *376 the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge unless he objects thereto before the jury retires to consider its verdict, stating the matter to which he objects and the grounds of his objection."
A.R.Civ.P. 51. In the case at bar, we find nothing in the record that suggested to the trial court that it charge the jury on the "clear and convincing" standard; more importantly, we find no objection to the trial court's failure to so charge the jury.
The final ground upon which CAEC rests its procedural due process argument is that the trial court erred by not charging the jury with the guidelines set forth by this Court in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986) (and clarified in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989)). As with the "clear and convincing" issue, however, CAEC did not object to the trial court's failure to give such an instruction, nor did CAEC request such an instruction.
In summary, we hold that all of CAEC's procedural due process arguments are not properly before this Court.
2. Substantive due process
Does the due process clause of the Fourteenth Amendment require that juries be guided by objective criteria in order to properly assess punitive damages? Stated perhaps more accurately, is it fundamentally unfair for a jury to award punitive damages without the guidance of objective criteria?
We recognize, indeed, we are faced almost daily with, the comments of various jurists, philosophers, scholars, and members of the national bar assailing the practicality in civil cases of the jury system and lamenting its continued existence. The three bases of criticism most often voiced are the helplessness and lack of sophistication of jurors obligated to resolve issues in complex litigation; the tendency of modern juries to overcompensate injured tort victims for noneconomic damages; and the "unbridled" discretion jurors enjoy in imposing massive punitive damages awards. On the larger scale, those complaints, and the very issue under review here, are really attacks on the civil justice system as a whole.
Just because "juries have always done it that way" is no adequate response. But we must pause to recall that, until very recently, attacks on jury verdicts have not been rooted in the federal constitution. History instructs us that, in the typical case involving noneconomic damages and punitive damages, once the jury has been instructed on and determines liability, the amount of compensation to be awarded and the extent of punishment to be meted out are subjects unquestionably within the sacred domain of the jury's discretion. A large jury verdict was subject to judicial revision only if the form of the verdict was incorrectably flawed, or if the verdict was undeniably the product of some improper motive, such as bias or prejudice, or bent with an improper emotion, such as passion.
Tossed into the lessons of the past is the fact that the only damages available in a wrongful death action brought pursuant to Alabama law are punitive damages. The sanctity of human life, the noble goal of preserving human life, and society's desire to punish those whose conduct results in the loss of human life, have all been accepted by our Legislature as criteria outweighing the seeming anomaly of permitting punitive damages for simple negligence. This view rests on the premise that one may be adequately compensated for his injuries, but the value of a human life has no measure. Punishing the tort-feasor dissuades others from engaging in life-endangering conduct.
To paraphrase a famous (or infamous) quotation, the American system of civil justice is the worst in the worldexcept for all of the rest. As the "problems" with the jury system have been pointed out with increasing frequency, so has the justice system responded.
If a defendant is dissatisfied with a jury's verdict, and feels that it is excessive, or otherwise flawed, he is entitled to the protection of a variety of safeguards. The defendant may move for remittitur and a new trial in the trial court, and may appeal *377 as a matter of right from the denial of either. He is entitled to a de novo review of the jury's verdict on appeal.[2] The appellate courts in this state have the authority to order a new trial due to the excessiveness of the verdict, to conditionally order a new trial unless the plaintiff accepts a remittitur,[3] and to order the trial court to conditionally order a new trial unless the plaintiff accepts a remittitur.[4]
If a defendant properly moves the trial court to do so, the trial court is obligated to state on the record its reasons for either interfering with the jury's verdict or not interfering with it.[5] And, in making the determination of whether the verdict is excessive (or inadequate), a trial court is authorized to consider the following non-exclusive list of factors:
"`(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.
"`(2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.
"`(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.
"`(4) The financial position of the defendant would be relevant.
"`(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.
"`(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.
"`(7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award.'"
Green Oil Co. v. Hornsby, 539 So.2d 218, 223-24 (Ala.1989) (quoting Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062 (Ala. 1987) (Houston, J., concurring)).
Punitive damages should not exceed an amount necessary to accomplish society's goals of punishment and deterrence. But the degree of punishment necessary to achieve those goals changes with each case. In the rarest cases, involving the most egregious conduct, juries should be entitled to punish defendants so severely as to destroy them; justice demands that.[6] But in the typical punitive damages case, the award should punish without destroying. That, in a nutshell, is the way punitive damages and the civil justice system coexist.
The identical case tried to different juries will likely produce different results, but that does not necessarily smack of a lack of fundamental fairness. That is inherent in the nature of juries, given the imperfection of man and his system of justice. Some discretion must be afforded to juries to assess punitive damages as they see fit. We can envision no set of carved-in-granite standards that would guide every jury in every conceivable case. Discretion tolerates elasticity, but the jury's discretion is by no means unbridled. The "whims" of any given jury are still harnessed by the *378 authority of the trial court and appellate courts.
Due to the safeguards now in place in Alabama, we find no merit to CAEC's allegation that its rights to substantive due process have been denied, or, based on the issues preserved for our review, that our wrongful death statute is unconstitutional. We have confidence in our system of civil justice and faith that that system will accommodate change as it is required.
We close our discussion with the wisdom of Mr. Justice Cardozo:
"The eccentricities of judges balance one another. One judge looks at problems from the point of view of history, another from that of philosophy, another from that of social utility, one is a formalist, another a latitudinarian, one is timorous of change, another dissatisfied with the present; out of the attrition of diverse minds there is beaten something which has a constancy and uniformity and average value of greater than its component elements. The same thing is true of the work of juries. I do not mean to suggest that the product in either case does not betray the flaws inherent in its origin. The flaws are there as in every human institution. Because they are not only there but visible, we have faith that they will be corrected. There is no assurance that the rule of the majority will be the expression of perfect reason when embodied in constitution or in statute. We ought not to expect more of it when embodied in the judgments of the courts. The tide rises and falls, but the sands of error crumble."[7]

II.
CAEC argues that the trial court erred in failing to grant a directed verdict or JNOV in its favor on the issues of negligence and wantonness. We disagree.
This action was pending prior to June 11, 1987; therefore, Code 1975, § 12-21-12, as amended, does not apply and the applicable standard of review is the "scintilla rule." Kizziah v. Golden Rule Insurance Co., 536 So.2d 943 (Ala.1988).
In Caterpillar Tractor Co. v. Ford, 406 So.2d 854, 856 (Ala.1981), this Court stated the standard of review applicable to a directed verdict:
"A directed verdict is proper only where there is a complete absence of proof on an issue material to the claim or where there are no disputed questions of fact on which reasonable people could differ. Deal v. Johnson, 362 So.2d 214 (Ala.1978)....
"In addition, the trial court must view the entire evidence, and all reasonable inferences which a jury might have drawn therefrom, in the light most favorable to the non-moving party. Alabama Power Company v. Taylor, 293 Ala. 484, 306 So.2d 236 (1975); Vintage Enterprises, Inc., v. Cash, 348 So.2d 476 (Ala. 1977)."
See also Orr v. Turney, 535 So.2d 150, 154 (Ala.1988).

A. Negligence

There was sufficient evidence of negligence to withstand a motion for a directed verdict and a motion for a judgment notwithstanding the verdict. As a supplier of electricity, CAEC is not an insurer of the safety of the general public and is not under an obligation to so safeguard its lines or equipment that by no possibility can injury result therefrom. The duty of an electrical company is to exercise that degree of care commensurate with the danger involved. Alabama Power Co. v. Tatum, 293 Ala. 500, 306 So.2d 251 (1975); Alabama Power Co. v. Berry, 254 Ala. 228, 48 So.2d 231 (1950).
"`In Bush v. Alabama Power Co., 457 So.2d 350, 353 (Ala.1984), the Court restated the duty of a power company with regard to the use and location of uninsulated electrical lines: "The duty of an electric company, in conveying a current of high potential, to exercise commensurate care under the circumstances, requires it to insulate its wires, and to use reasonable care to keep the same *379 insulated, wherever it may reasonably be anticipated that persons, pursuing business or pleasure, may come in contact therewith. This statement of the rule implies that, in the absence of statute or municipal ordinance, it is not necessary to insulate wires which are so placed that no one could reasonably be expected to come in proximity to them." Foster v. Alabama Power Co., 395 So.2d 27, 30 (Ala.1981), citing Curtis on the Law of Electricity, § 510. In other words, Alabama Power must either insulate its electrical lines, or locate them in a position where they pose no danger to human life. However, the duty to insulate does not arise absent notice, actual or constructive, that persons may come into contact with the uninsulated wires. Alabama Power Co. v. Alexander, 370 So.2d 252 (Ala.1979).'"
Alabama Power Co. v. Cantrell, 507 So.2d 1295, 1297 (Ala.1986) (quoting Alabama Power Co. v. Brooks, 479 So.2d 1169, 1172 (Ala.1985)). (Emphasis added.)
Tapley's expert testified that the height of the line was in violation of the NESC, because "given local conditions were not considered." He testified that "local conditions" means that "you should take into consideration everything that's possible to take into consideration to preserve the safety of the lines." Although this conflicts with other expert testimony, this is sufficient evidence of negligence for the jury to consider, for CAEC erected the line lower than the body of the trailer dump would reach when in a raised position. Even though CAEC assumed that there would be no dumping in the area of the line, a fact question existed as to whether CAEC should have foreseen that trailer dumps would be raised to an upright position in that area. Negligence can be predicated upon a defendant's failing to appreciate the hazards of conditions it creates. Bush v. Alabama Power Co., 457 So.2d 350 (Ala.1984). We hold that the trial court did not err in failing to grant a directed verdict or JNOV in favor of CAEC on the negligence count.

B. Wantonness

What constitutes wanton misconduct depends upon the facts presented in each particular case. Brown v. Turner, 497 So.2d 1119 (Ala.1986); Trahan v. Cook, 288 Ala. 704, 265 So.2d 125 (1972); Westbrook v. Gibbs, 285 Ala. 223, 231 So.2d 97 (1970). In Lynn Stickland Sales & Service, Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142 (Ala.1987), the majority of this Court made it perfectly clear that wantonness, which requires some degree of conscious culpability, is not to be confused with negligence, (i.e., mere inadvertence):
"Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury....
"Negligence is usually characterized as inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as an act which cannot exist without a purpose or design, a conscious or intentional act. `Simple negligence is the inadvertent omission of duty; and wanton or willful misconduct is characterized as such by the state of mind with which the act or omission is done or omitted.' McNeil v. Munson S.S. Lines, 184 Ala. 420, 425, 63 So. 992 (1913). [Emphasis added.] ...
". . . .
"`Willful and wanton conduct has a well-defined meaning at law. It is sometimes expressed in terms of "reckless disregard of the safety of another." Willful and wanton conduct should not be confused with negligence. It has been correctly stated that the two concepts are as "unmixable as oil and water."' [Citation omitted, emphasis added.]
"`... Willfulness or wantonness imports premeditation, or knowledge and consciousness that the injury is *380 likely to result from the act done or from the omission to act, and strictly speaking, is not within the meaning of the term "negligence," which conveys the idea of inadvertence, as distinguished from premeditation or formed intention.'" [Citation omitted, emphasis added.]
510 So.2d at 145-46 (emphasis added).
Is there a scintilla of evidence that, in placing the uninsulated line at the place and height that it was erected, CAEC knew that injury would likely result? We find the requisite scintilla of evidence to support a wantonness claim from Holman's testimony:
"Q. ... And, the decision was made not to put an orange ball on this line; wasn't it?
"A. We didn't have any.
"Q. You didn't have any? Oh, you didn't have any? You would have put them up there?
"A. Yes, sir, we would've put them up there.
"Q. But, you didn't have any right then. You went ahead and hooked that power up; didn't you?
"A. Yes, sir, we hooked the power up.
". . . .
"Q. ... [Y]ou don't leave it up to the customer as to orange balls, do you? You make that decision.
"A. Yes, sir.
"Q. And, you had already made that decision to put orange balls up, but you didn't have any in stock.
"A. Yes, sir.
"Q. And, orange balls are designed for safety; aren't they? That's what you told me on.
"A. Well, you can call it that. A reminder, ever how you want to use it.
"Q. But, its designedits a safety device.
"A. To let you know its up there.
". . . .
"Q. You don't buy, you don't adhere, you don't adopt the theory that orange balls serve no real or useful purpose?
"A. Well, we hoped they would.
"Q. So, you say that orange balls do serve a real or useful purpose?
"A. We hoped people would look at them.
"Q. And, that's why you put them up there; isn't that true?
"A. To try and remind people that its up there.
"Q. And, that's why you intended to put them up here on this one; isn't that true?
"A. Yes, sir.
". . . .
"Q. ... But, Mr. Holman, you intended to put a ball right here, even though you tell us that there wasn't going to be any dumping. You intended to put a ball over the roadway, and you didn't have any in stock: Isn't that what you told us?
"A. Yes, sir.
". . . .
"Q. Mr. Holman, am I understanding you correctly, that you say you had always intended in spite of what Mr. Ingram told you, that there wasn't going to be any high equipment, that you always intended, from the very beginning, to put a ball over there?
". . . .
"A. Yes, sir, we intended to put a ball on it."
Although some other witnesses testified that orange balls were used as a warning for low flying aircraft and were helpful in seeing power lines from a distance, Holman does not further explain why he intended to place orange balls on the line. Furthermore, despite knowing the approximate height to which the truck beds would rise and despite knowing that truck beds were raised in several locations on the premises, CAEC nevertheless erected the lines well below the height to which the truck beds were raised. Viewing this testimony and evidence in the light most favorable to Tapley, we cannot hold that, as a matter of law, it would be unreasonable for a jury to infer that Holman, as district manager of CAEC, was aware that there was a likelihood that equipment *381 might come in contact with the uninsulated line and that, if it did so, injury was likely to occur. This was sufficient for the trial court to submit the issue of wantonness to the jury.

III.
CAEC next argues that Tapley was contributorily negligent as a matter of law. In a recent case somewhat similar to the one before us today, we did find contributory negligence as a matter of law. See Watters v. Bucyrus-Erie Co., 537 So.2d 24 (Ala.1989). As with negligence generally, however, a finding of contributory negligence turns on the facts and circumstances unique to each case; for that reason, contrary to the suggestion of Justice Houston's dissenting opinion, we need not overrule Watters, for the holding in that case, too, was dependent upon its own particular facts. To be sure, the conduct of the decedent in this case was such that the defendant could justifiably argue, with strong conviction, that the jury should deny recovery because of the decedent's contributory negligence.[8] That can not be our focus, however. Contributory negligence is an affirmative defense that the defendant bears the burden of proving. Rule 8(c), A.R.Civ.P. "Contributory negligence is for the jury where there is a scintilla of evidence to the contrary. Elba Wood Products, Inc. v. Brackin, 356 So.2d 119 (Ala. 1978)." Bullen v. Roto Finishing Systems, 435 So.2d 1256, 1259 (Ala.1983); see Hatton v. Chem-Haulers, Inc., 393 So.2d 950, 954 (Ala.1980).
In order to sustain a finding of contributory negligence as a matter of law, there must be a finding that the plaintiff put himself in danger's way, Mackintosh Co. v. Wells, 218 Ala. 260, 118 So. 276 (1928), and a finding that the plaintiff appreciated the danger confronted, Wilson v. Alabama Power Co., 495 So.2d 48 (Ala.1986); Marquis v. Marquis, 480 So.2d 1213 (Ala.1985); Baptist Medical Center v. Byars, 289 Ala. 713, 271 So.2d 847 (1972); Mackintosh Co. v. Wells, supra. Moreover, it must be demonstrated that the plaintiff's appreciation of the danger was a conscious appreciation at the moment the incident occurred. Marquis v. Marquis, supra; Elba Wood Products, Inc. v. Brackin, supra. Mere "heedlessness" is insufficient to warrant a finding of contributory negligence as a matter of law. Decatur Light, Power & Fuel Co. v. Newsom, 179 Ala. 127, 59 So. 615 (1912).
Indulging all favorable presumptions to sustain the trial court's conclusion, Marquis v. Marquis, supra, and viewing the tendencies of the evidence in the light most favorable to the party not urging error, we are unable to impose upon this plaintiff the extraordinary consequences of a finding of contributory negligence as a matter of law. After thoroughly scouring the record, we find no evidence that the plaintiff's decedent knew the height of the subject power lines; no evidence that he knew the height to which his dump bed would rise; and no evidence that he knew the lines were uninsulated. He did know that CAEC had been at the plant and that CAEC had made a studied and deliberate decision on how to erect the lines; he therefore may well have assumed that the lines would have been high enough to accommodate his truck while in operation. Finally, we will not hold that he deliberately raised his dump bed into the wires and then purposefully electrocuted himself; such a holding would be repugnant to simple logic and to the tendencies of the evidence presented.
We conclude that there was sufficient evidence to contradict CAEC's defense of contributory negligence and thus to warrant resolution of this issue by the jury.

IV.
CAEC maintains that the Legislature acted arbitrarily and irrationally in excepting wrongful death actions from the operation of §§ 6-11-20 and -21, Code 1975. This exception is codified at § 6-11-29. Because this cause of action was pending prior to June 11, 1987, however, these statutes are inapplicable. See Code 1975, *382 § 6-11-30. While we express no view on the merits of this issue, we observe that, for whatever reason, it is clear that the Legislature's purposeful exclusion of wrongful death actions is totally consistent with the wrongful death statute and with this Court's interpretation and application thereof.

V.
CAEC next contends that the trial court erred in denying its motion in limine with respect to all evidence of orange markers or balls. Prior to trial, in considering the motion, the following exchange between the court and one of CAEC's lawyers took place:
"COURT: If the evidence will support their contention, that is, in every case they should have put [the markers or balls] up there, maybe they should. I don't know what Judge McElroy says [an apparent reference to C. Gamble, McElroy's Alabama Evidence (3d ed. 1977)]. It may be that [CAEC's] practice is to put balls up there and make them visible and to call people's attention to the fact that they are there.
"PETE COBB: Judge, we just insist, that before any mention, that I except to the plaintiff being able to mention three. But, before any mention of more than three by anybody comes on, we want a ruling from the court as to whether or not they can mention more than three.
"COURT: We will go with that for the time being until tomorrow morning."
That colloquy consists of the entire "ruling" on the motion in limine. Throughout the plaintiff's opening statement, and upon examination of several witnesses during the plaintiff's case-in-chief, several references were made to orange balls or markersall without objection.
In Perry v. Brakefield, 534 So.2d 602 (Ala.1988), we summarized Robinson v. Kierce, 513 So.2d 1005 (Ala.1987), and Killingsworth v. Killingsworth, 283 Ala. 345, 217 So.2d 57 (1968), and the law of issue preservation as it relates to motion in limine practice. "The clear holding of these cases is that unless the trial court's ruling on the motion in limine is absolute or unconditional, the ruling does not preserve the issue for [appellate review]." Perry, 534 So.2d at 606. If the ruling is not absolute, proper objections at trial are necessary to preserve the issue. Liberty Nat'l Life Ins. Co. v. Beasley, 466 So.2d 935, 936 (Ala.1985). Because the trial court's ruling in the instant case was not absolute, and because several subsequent references to orange balls or markers were made without objection, we conclude that the propriety of the trial court's action is not before us.

VI.
The sixth issue raised by CAEC involves the trial court's granting of the plaintiff's motion in limine to exclude evidence of the plaintiff's decedent's violation of Code 1975, § 37-8-52, and the trial court's failure to charge the jury on the effect of that section. We address each contention separately.

A. Motion in limine

Plaintiff filed a motion in limine to exclude any testimony, argument, or other reference to § 37-8-52. We have searched the record and find no ruling on that motion whatsoever. We can not, then, put the trial court in error on this issue.

B. Jury charge

CAEC sought to have the jury charged on the effect of § 37-8-52, and, when the trial court failed to so charge, it interposed a general objection. "[N]ot only must an objection to the trial court's refusal to give an instruction be made, but the objection must be made specifically and must be supported by grounds in order for review to be [heard] in the appellate court." Burnett v. Martin, 405 So.2d 23, 28 (Ala. 1981). The general objection in the case at bar, merely "to the court's failure to give written charge ... 20," was inadequate to preserve this issue for review.

VII.
The final issue raised by CAEC involves remarks made by the plaintiff's lawyer in his closing argument.
*383 At one point, the plaintiffs' lawyer argued:
"I can stand here and tell you that when you are flying an airplane, and it starts to go down, worth 26 million dollars, they tell that pilot to jump out.
". . . .
"Let's ring the bell of justice. Let's believe in this lady who just started out, finally, after three children, and then finally has an opportunity to enjoy life with her lifelong mate...."
Without commenting on the propriety of these arguments, we note that the trial court sustained CAEC's objections, overruled its motion for a mistrial, and as to the latter argument, promptly instructed the jurors to "disregard that argument." We also note that, in its charge to the jury, the court instructed the jurors that the verdict must be based "on the law that I have given you and the evidence in this case," and that the "verdict can not be based on sympathy, bias, or prejudice."
Assuming, without deciding, that the arguments made were improper, we hold that the trial court's actions were sufficient to prevent prejudicial error. See Black Belt Wood Co. v. Sessions, 514 So.2d 1249, 1254 (Ala.1986).

Conclusion
Because we have found no reversible error in this case, the judgment of the trial court is due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and JONES, SHORES, ADAMS and KENNEDY, JJ., concur.
ALMON, J., concurs in the result.
MADDOX, HOUSTON and STEAGALL, JJ., dissent.
MADDOX, Justice (dissenting).
I cannot distinguish the facts of this case from those of Watters v. Bucyrus-Erie Co., 537 So.2d 24 (Ala.1989); therefore, I must respectfully dissent.
While I need not reach, in this case, the substantive due process issues concerning the award of punitive damages, I have previously addressed this question. See, my separate opinion in Alabama Power Co. v. Cantrell, 507 So.2d 1295 (Ala.1986), in which I concurred in part and dissented in part, and my concurring and dissenting opinion in Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812 (Ala. 1989), in which I stated that I thought the "excessive fines" clauses of both the state and federal constitutions apply to punitive damages in civil cases. As I stated in Justice Houston's case of Wilson v. Dukona Corp., 547 So.2d 70 (Ala.1989), I want to await the decision in the case of Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vermont, Inc., 845 F.2d 404 (2d Cir.1988), cert. granted in part, ___ U.S. ___, 109 S.Ct. 527, 102 L.Ed.2d 559 (1988), before I write further on this issue.
HOUSTON, Justice (dissenting).
I find it difficult not to concur with any opinion that cites The Nature of the Judicial Process (1921), for I have great respect for and stand in awe of the man who was the 75th United States Supreme Court Justice, Mr. Justice Benjamin N. Cardozo, and his judicious writings. However, I do not reach the substantive due process issue, for I would reverse and remand on the issue of contributory negligence.[1]
The majority admits that the facts in this case are "somewhat similar to" those in Watters v. Bucyrus-Erie Co., 537 So.2d 24 (Ala.1989). I would say that I could not hold as the majority does without expressly overruling Watters. There is an overwhelming weight of evidence of contributory negligence.
The majority opinion recites the fact that the line with which Tapley's trailer dump came in contact had been erected by CAEC within a week of Tapley's death. The majority opinion omits to recite that Tapley knew that the line had been installed. Tapley *384 helped install the line within the week before his death. This evidence is undisputed. Tapley and the driver with whom he normally drove discussed the location of the service pole to which the line was attached. Tapley, an experienced truck driver, had worked for the asphalt plant for approximately six years. He attended safety meetings at least twice a month, where the hazard of overhead power lines was regularly discussed. In addition, every truck or trailer in the operation, including Tapley's, had clearly visible warning labels:

"CAUTION
"STAY AT CONTROLS WHILE DUMPING AND LOWER BODY IMMEDIATELY IF BODY LEANS OR SHIFTS TO ONE SIDE WHILE DUMPING.
"PRIOR TO RAISING BODY, CHECK TO BE SURE BODY WILL NOT CONTACT POWER LINES OR OTHER OBSTRUCTIONS WHEN IN THE UP POSITION." [Emphasis added.]

"CAUTION
"1. Improper operation of this unit can result in serious injury. Do not operate unless you have been properly instructed and are familiar with the operation of this unit.
". . . .
"7. Do not leave vehicle during dumping cycle. Remain at the controls. Release the tail gate controls before lifting the body.
". . . .
"11. Never raise body where overhead obstructions may exist. Never raise body in proximity of power lines as serious injury may result." [Emphasis added.]
The accident happened at 7:45 A.M. The line was visible from directly underneath and for a distance of 100 to 200 yards. All of this evidence is undisputed. If any of this was disputed, it could be disregarded in favor of the contradictory evidence, in viewing the evidence most favorably to the winning side, but it is all undisputed; therefore, it must be considered in reviewing the trial court's refusal to grant CAEC's motions.
In its final order, the trial court stated that "[t]here was ample evidence upon which the jury could have found [Tapley] guilty of contributory negligence...." I conclude that the facts were such that all reasonable people must draw the same conclusionthat Tapley was contributorily negligent; and, therefore, that Tapley was contributorily negligent as a matter of law. Hatton v. Chem-Haulers, Inc., 393 So.2d 950 (Ala.1980). This is consistent with this Court's holding in Watters; Wilson v. Alabama Power Co., 495 So.2d 48 (Ala.1986); Quillen v. Quillen, 388 So.2d 985 (Ala. 1980).
CAEC moved for a directed verdict as to the issue of contributory negligence at the end of all the evidence, arguing that it was entitled to a judgment as a matter of law on the negligence count because of its affirmative defense of contributory negligence. CAEC also filed a motion for a judgment notwithstanding the verdict, in which it realleged that same ground. CAEC's motion for a directed verdict and motion for a judgment notwithstanding the verdict should have been granted on CAEC's affirmative defense of contributory negligence.
"Where a defendant files a motion for directed verdict as to a count which is not supported by the evidence, detailing with specificity the grounds upon which the particular count is not supported by the evidence and the Court denies the motion, a general jury verdict will not be presumed to have been returned on a count which is supported by the evidence. John Deere Industrial Equipment Co. v. Keller, 431 So.2d 1155 (Ala.1983); Aspinwall v. Gowens, 405 So.2d 134 (Ala. 1981)."
Russellville Production Credit Ass'n v. Frost, 484 So.2d 1084, 1087-88 (Ala.1986); see also C & S Financial Services v. Bradley, 501 So.2d 1218 (Ala.1987); Mobile Dodge, Inc. v. Alford, 487 So.2d 866 (Ala. 1986). I would reverse and remand for a new trial on wantonness.
*385 I do not understand footnote eight of the per curiam opinion. Unless the majority of this Court is convinced that the ratio decidendi of the doctrine of contributory negligence would not "`hypothetically be consented to today by the conscience and the feeling of justice of the majority of all those whose obedience is required by [that] rule of law,'" Southern States Ford, Inc. v. Proctor, 541 So.2d 1081 (Ala.1989) (Houston, J., concurring specially), then I would assume that this Court would follow the doctrine of stare decisis.
STEAGALL, J., concurs.
NOTES
[1] The Attorney General was notified by this Court that this issue was pending and, after reviewing the briefs of counsel, the Attorney General declined to submit a brief. See A.R. App.P. 44(d).
[2] Code 1975, § 12-22-71.
[3] E.g., United Services Auto. Ass'n v. Wade, 544 So.2d 906 (Ala.1989).
[4] E.g., Gulf Atl. Life Ins. Co. v. Barnes, 405 So.2d 916 (Ala.1981).
[5] E.g., Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986).
[6] See Ridout's-Brown Service, Inc. v. Holloway, 397 So.2d 125, 127-28 (Ala.1981) (Jones, J., concurring).
[7] Cardozo, The Nature of the Judicial Process 143 (1921).
[8] This Court might be willing to again entertain, in an appropriate case, the idea of adopting the doctrine of comparative negligence. See Golden v. McCurry, 392 So.2d 815 (Ala.1981).
[1] In reference to the discussion in Section IV of the per curiam opinion, I readopt my reasoning in footnote 10 of my dissent in Tatum v. Schering Corp., 523 So.2d 1042, 1060 (Ala.1988).