567 So.2d 1222 (1990)
Larry Thomas CAMPBELL and Cathy Campbell
v.
ALABAMA POWER COMPANY.
88-1052.
Supreme Court of Alabama.
July 13, 1990.
Rehearing Denied September 14, 1990.
*1223 M. Clay Alspaugh, Robert D. Word III and Barry W. Hair of Hogan, Smith, Alspaugh, Samples & Pratt, Gadsden, for appellants.
John P. Scott, Jr., T. Dwight Sloan and Martha P. Boyd of Balch & Bingham, Birmingham, and Billy L. Church of Church, Trussell & Robinson, Pell City, for appellee.
Michael Gillion and M. Kathryn Knight of Miller, Hamilton, Snider & Odom, Mobile, for amicus curiae Alabama Defense Lawyers Ass'n.
ALMON, Justice.
Larry and Cathy Campbell[1] filed an action against Alabama Power Company and others for damages and injuries sustained when Campbell came in contact with an electric power line. The complaint alleged that Alabama Power was negligent in the maintenance and location of a power supply line over a public road. This appeal is from a judgment based on a directed verdict in favor of Alabama Power.
At the time of the accident, Campbell was employed by Ray Nesmith, who was in the business of moving houses. Nesmith had been hired to move a house located within the Pell City city limits to a lot located outside the city limits. As part of the preparation for moving the house, "scoot" poles were attached to the roof of the house to allow overhead wires to slide over the roof as the house passed along the road. These scoot poles were pieces of lumber that ran from the roof peak down over the eaves of the house, forming an arch over the roof. To assist in crossing under traffic lights, telephone lines, and power lines, Campbell was positioned on top of the house with an extra scoot pole, gloves, and a hammer with a fiberglass-rubber handle. During the move, an electric power line came in contact with the roof of the house. Dale Campbell, Campbell's brother, climbed on top of the house to help remove the line and keep the neutral wire and the "hot" wire separate while Campbell maneuvered them off the roof. While Campbell was attempting to free the wires, he slipped down the roof and, to prevent a fall, grabbed both the neutral wire and the hot wire. He was knocked unconscious and his hands were severely burned, requiring amputation of both arms below the elbow.
Campbell argues several issues in his appeal to this Court: (1) that the trial court erred in granting Alabama Power's motion for a directed verdict based on a finding of contributory negligence as a matter law; (2) that this Court should judicially adopt a comparative negligence standard; and (3) that the trial court erred in failing to compel Alabama Power to produce an investigative report it had prepared, containing measurements of the house and height of the power lines as they existed on the day of the accident.
As to his first issue, Campbell contends that there was no evidence produced showing that he was not acting with due care, and he argues that both he and his brother were using the customary practices that house movers use in handling electric *1224 wires. He offers his brother's testimony in support of this argument:
"Q. Were you being careful in what you did?
"A. Yes, sir.
"Q. Were you using the customary practice that house movers use in trying to keep those lines separated?
"A. Yes, sir."
He asserts that whether he was acting reasonably is a question of fact and, therefore, that the issue should have been submitted to the jury.
A review of the record reveals that Campbell was an experienced house mover and, by his own admission, had moved hundreds of houses during his work history. He, like his brother, was aware of the difference between insulated electric lines and uninsulated lines. Even though he had never come into contact with an uninsulated high voltage wire prior to this accident, it is clear that he was aware of their danger.
In Wilson v. Alabama Power Co., 495 So.2d 48 (Ala.1986), a 15-year-old boy was severely injured when he came in contact with a 7,200-volt power line while climbing in a tree. This Court affirmed a holding that the boy was contributorily negligent as a matter of law because he was aware that the power line ran through the tree, appreciated the danger, and, despite this, elected to climb into the tree anyway. Similarly, in Watters v. Bucyrus-Erie Co., 537 So.2d 24 (Ala.1989), plaintiff's decedent was found contributorily negligent as a matter of law because he was aware of a power line above his work area and understood the consequences of touching the power line with the crane boom he was operating, but nevertheless pulled the boom into contact with the line.
In this case, Dale Campbell testified that both he and his brother recognized the danger the wires posed:
"Q. And all the thousands of houses that you say that you moved you, you recognize those as being high powered transmission lines, that is, had pretty high voltage on them?
"A. Yes, sir.
"Q. And you looked at them, and you knew that, didn't you?
"A. Yes, sir.
"Q. And when you saw them stuck up there, that house was stopped, wasn't it?
"A. Yes, sir.
"....
"Q. While the house was stopped there, before Larry got in contact with those lines, did it ever occur to you to call the Power Company?
"A. No, sir.
"Q. Did Mr. Nesmith say anything about that?
"A. No, sir. Not that I recall.
"Q. Did Larry say anything about that?
"A. No, sir."
A directed verdict is proper only where there is a complete absence of proof on an issue material to the claim or where there are no disputed questions of fact on which reasonable people can differ. Deal v. Johnson, 362 So.2d 214 (Ala.1978). To sustain a finding of contributory negligence as a matter of law, there must be a finding that the plaintiff put himself in danger, appreciated the danger, and had a conscious appreciation at the moment the incident occurred; mere heedlessness is insufficient. Central Alabama Electric Coop. v. Tapley, 546 So.2d 371, 381 (Ala. 1989) (citations omitted). Although Tapley also concerned an accident with an uninsulated electric line, the facts of that case are distinguishable from the present facts. In Tapley the electric lines in question had been erected just one week prior to the accident. There was no evidence presented to indicate that the decedent knew the wires were uninsulated or that he was aware of the height at which the power lines were strung or the height to which the truck bed could be raised.
Likewise, another recent case, Electric Service Co. of Montgomery v. Dyess, 565 So.2d 244 (Ala.1990), is also distinguishable. In that case, Dyess was working from a lift and was badly burned when he *1225 came in contact with a power line. Although Dyess was generally aware of the power line and of its danger to him, this Court affirmed a holding that he was not contributorily negligent as a matter of law, because there was evidence that he had relied on the electric service company to position the utility poles at the appropriate distance from the power line and was not aware of his proximity to the line before he contacted it. This Court affirmed because Dyess could not be said, as a matter of law, to have had a conscious appreciation of the danger posed by his proximity to the power lines at the time of the accident.
In contrast to the facts of those cases, in this case Campbell saw the power line and was fully aware of the danger that it posed to him. Campbell testified:
"Q. And, I think when your lawyer was asking you, Mr. Alspaugh was asking you about high powered lines, you know what a high powered electric line looks like, don't you?
"A. Yes, sir.
"Q. And, you have been working around electricity for many, many years?
"A. Yes, sir.
"....
"Q. And in the house moving business down through the years, you have seen many of those uncovered lines across roads and so forth, haven't you?
"A. Yes, sir.
"Q. And you know that those uncovered lines are high powered transmission lines?
"A. Yes, sir.
"Q. And they have high voltage on those type lines?
"A. Yes, sir.
"....
"Q. And you know, or anyonewe withdraw that. Those high powered, uncovered lines, you know if you come in contact with them that it would be dangerous?
"A. Yes, sir."
In spite of his awareness of the danger, Campbell elected to remain on the house and attempt to move the wires. Because he voluntarily placed himself in a position of danger, he can not defeat a contention that he was contributorily negligent by asserting that he merely grabbed the wires to prevent falling off the house. One who wrongfully and voluntarily puts himself in a position of danger cannot invoke the "sudden emergency" doctrine and thereby escape a charge of contributory negligence. Swindall v. Speigner, 283 Ala. 84, 214 So.2d 436 (1968).
Campbell next argues that this Court should judicially adopt a comparative negligence standard, and he cites, in support of that argument, the recent case of Alabama Electric Coop. v. Tapley, supra, fn. 8. He urges that this Court "refuse to continue to defer to the legislature for action and to now exercise its own inherent power." However, Campbell did not make this argument regarding comparative negligence before the trial court. It is well settled that issues not raised in the trial court may not later be raised on appeal. Green v. Taylor, 437 So.2d 1259 (Ala.1983).
Because of our holding that the trial court did not err in holding that Campbell was contributorily negligent as a matter of law, we pretermit consideration of Campbell's third issue, regarding production of Alabama Power's investigative report.
AFFIRMED.
MADDOX, ADAMS, HOUSTON and STEAGALL, JJ., concur.
HORNSBY, C.J., and JONES and SHORES, JJ., dissent.
HORNSBY, Chief Justice (dissenting).
Because I conclude that there was evidence tending to show that the plaintiff was not contributorily negligent, I must respectfully dissent. The plaintiff in this case put forth evidence to show that he was doing only what a reasonable, prudent house mover would do under like circumstances. There was evidence to show that the plaintiff was using insulated tools to attempt to remove the power line, which *1226 was stuck on the house. There was testimony from an engineer tending to show that the plaintiff was using proper tools and was proceeding in what could be considered a reasonably safe manner.
The plaintiff was employed as a house mover. On the occasion of the accident giving rise to this suit, the plaintiff was involved in moving a house from Pell City, Alabama, to a location outside of that town. The plaintiff had been involved in moving a number of houses before the date of this accident. On this occasion, however, the plaintiff was an employee of Nesmith, another house mover. The plaintiff had been given some gloves, a "scoot pole," and a rubber/fiberglass-handled hammer to use in freeing any power lines that might become entangled on the house. Several wooden "scoot poles" had been attached to the front roof of the house in order to allow power lines and telephone lines to slide easily over the roof without becoming entangled with roofing material or other obstructions attached to the roof of the house.
The move was uneventful until the moving party encountered uninsulated power lines owned and maintained by Alabama Power Company (hereinafter "APCo"). Telephone lines, which were lower than the APCo lines, had already been encountered and successfully passed under. However, these APCo lines, which were undisputedly lower than is allowed by the National Electric Safety Code, became snagged on the house roof. This event necessitated that the plaintiff first keep these uninsulated lines from touching each other, in order to avoid a fireball and its obvious consequences. Also, it was necessary that someone free the power lines from their obstruction so that the house could be moved forward.
The plaintiff and his brother ascended the roof of the house and began the process of freeing the power lines and moving the house forward. The plaintiff had caught one of the lines in the claw of his insulated hammer and had moved to the back side of the roof, away from the direction of travel. As the plaintiff moved toward the rear of the house, his brother, who was also on the roof, signaled a truck driver to begin moving the house forward. As the house began to move, the plaintiff lost his balance and fell. He grabbed both of the wires as he fell. Obviously, the plaintiff grabbed both wires out of a reflex reaction to losing his balance.
Evidence showed that the plaintiff was engaged in a normal practice in the business of housemoving. Also, evidence showed that fiberglass hammers, such as the one the plaintiff had used, had been so used in the housemoving profession for over a decade.
Ordinarily, the question of contributory negligence is to be left to the jury. Sungas, Inc. v. Perry, 450 So.2d 1085 (Ala. 1984). This Court has stated that the issue of contributory negligence must be left to the jury where the evidence is such that "different inferences and conclusions may reasonably be drawn" therefrom. American Furniture Galleries, Inc. v. McWane, Inc., 477 So.2d 369, 372 (Ala.1985) (citing Cooper v. Peturis, 384 So.2d 1087, 1088 (Ala.1980); Teele v. Gravlee, 294 Ala. 126, 128, 313 So.2d 169, 170 (1975)).
It is axiomatic that a finding of contributory negligence must be based upon the plaintiff's knowing of the condition or failure, appreciating the danger, and yet failing to exercise reasonable care for his own safety. Elba Wood Products, Inc. v. Brackin, 356 So.2d 119 (Ala.1978). Moreover, if there is a scintilla of evidence showing that the plaintiff did exercise due care, the question of contributory negligence must be submitted to the jury. Id. at 124. A plaintiff may not be found to have been contributorily negligent merely because he acted in a manner that indicated that he was "heedless" of the danger before him. Central Alabama Elec. Coop. v. Tapley, 546 So.2d 371 (Ala.1989).
I must note that the plaintiff's evidence showing that he acted carefully and in accordance with the customary safety practices of house movers in this case was not controverted. Therefore, when considered in connection with the matters stated above, it is apparent that the plaintiff produced *1227 evidence tending to show that he acted with due care in this incident. Thus, I conclude that the evidence is such that differing conclusions and inferences could be drawn therefrom, and consequently, the trial court erred when it ruled that the plaintiff had been contributorily negligent as a matter of law. American Furniture Galleries, Inc. v. McWane, Inc., supra, at 372.

Comparative Negligence
Additionally, I believe that it is time that this court acted to judicially adopt the comparative negligence standard for use in this state's courts. Although I agree with the majority's holding that adoption of a new standard is not properly before the court in this appeal, I do feel that the facts herein make this case an appropriate place to state my reasons in support of judicially adopting the comparative negligence analysis.
The contributory negligence method originated at the turn of the nineteenth century. See Butterfield v. Forrester, 11 East. 60, 103 Eng.Rep. 926 (1809). The actual meaning of the Butterfield case has been the subject of debate. Some commentators have stated that the rule of Butterfield may actually be something other than the contributory negligence doctrine that we have come to know today. See, e.g., E. Turk, Comparative Negligence On The March, 28 Chi.-Kent L.Rev. 189, 190-203 (1950); L. Green, Illinois Negligence Law, 39 Ill.L.Rev. 36 (1944-45).
The Butterfield rule entered American jurisprudence in the early case of Smith v. Smith, 18 Mass. (2 Pick. 621) (1824). H. Woods, Comparative FaultThe Negligence Case, § 1.2 (1978). Since that time, a large majority of American jurisdictions has rejected it. As of now, 44 states have adopted the comparative negligence standard. The contributory negligence standard steadily fell into such disrepute over the years that the nation that spawned the doctrine, England, abandoned it in favor of comparative negligence, through its Law Reform Act of 1945. J. Wade, Comparative NegligenceIts Development In The United States And Its Present Status In Louisiana, 40 La.L.Rev. 299, 302 n. 25 (1980).
Federal laws have also expressed a preference for a comparative fault system in apportionment of damages. Congress first expressed a preference for the comparative negligence method in 1908. H. Woods, supra, § 1:11 at p. 24. Such federal statutes as the Death On The High Seas Act, 46 U.S.C.App. § 766 (1982), the Jones Act, 46 U.S.C.App. § 688 (Supp.1985), and the Federal Employers Liability Act, 45 U.S.C. §§ 51-60 (1986) have adopted a comparative negligence approach in the apportionment of damages between two parties who may each be partially at fault in causing some injury. M. Rooney, C. Rooney, and R. Eatman, Comparative Negligence in New Hampshire: Its Effect on Contributory Negligence and Tort Law, 22 Suffolk U.L.Rev. 1, 3-4 (1988).
The contributory negligence method is a harsh and often inequitable standard. Its application is often the cause of unnecessary suffering and injustice. Professor Prosser himself has criticized the contributory negligence method:
"The attack upon contributory negligence has been founded upon the obvious injustice of a rule which visits the entire loss caused by the fault of two parties on one of them alone, and that one the injured plaintiff, least able to bear it, and quite possibly much less at fault than the defendant who goes scot free. No one ever has succeeded in justifying that as a policy, and no one ever will. Its outrageousness became especially apparent in the cases of injuries to employees, where a momentary lapse of caution after a lifetime of care in the face of the employer's negligence might wreck a man's life and leave him uncompensated as a charge upon society...."
W. Prosser, Comparative Negligence, 51 Mich.L.Rev. 465, 469 (1953).
In adopting the comparative negligence method, the Supreme Court of California stated:
"It is unnecessary for us to catalogue the enormous amount of critical comment *1228 that has been directed over the years against the `all or nothing' approach of the doctrine of contributory negligence. The essence of that criticism has been constant and clear: the doctrine is inequitable in its operation because it fails to distribute responsibility in proportion to fault. Against this have been raised several arguments in justification, but none have proved even remotely adequate to the task. The basic objection to the doctrinegrounded in the primal concept that in a system in which liability is based on fault, the extent of fault should govern the extent of liabilityremains irresistible to reason and all intelligent notions of fairness.
"Furthermore, practical experience with the application by juries of the doctrine of contributory negligence has added its weight to analyses of its inherent shortcomings...."
Li v. Yellow Cab Co. of California, 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226 (1975).
In judicially adopting comparative negligence in place of the contributory negligence standard, the Supreme Court of Michigan stated:
"There is little dispute among legal commentators that the doctrine of contributory negligence has caused substantial injustice since it was first invoked in England in 1809. Of significance in this regard is that almost every common-law jurisdiction outside the United States has discarded contributory negligence and has adopted in its place a more equitable system of comparative negligence. Even in this country, considered the only remaining primary location employing contributory negligence, 32 [now over 40] states and the United States Supreme Court in the case of admiralty law have discarded or rejected it in favor of some form of comparative negligence. This precedent is so compelling that the question before remaining courts and legislatures is not whether but when, how and in what form to follow this lead."
Placek v. City of Sterling Heights, 405 Mich. 638, 275 N.W.2d 511 (1979) (emphasis added).
There is an inevitable evolution "from contributory negligence through the doctrine of last clear chance to some form of comparative negligence or fault" and this is demonstrated by the number of jurisdictions abandoning contributory negligence in favor of comparative negligence systems. Gustafson v. Benda, 661 S.W.2d 11 (Mo.1983) (en banc). Courts have created numerous exceptions to the contributory negligence doctrine. It is often stated that mere contributory negligence will not be a defense to an action based upon the defendant's willful or wanton misconduct. Turkett v. Wedgeworth, 289 Ala. 106, 266 So.2d 265 (1972); Prosser, supra, at 470. Also, a plaintiff may not be denied recovery where he is contributorily negligent but the defendant fails to avoid harming him when the defendant has the "last clear chance" to avoid such injury. Stanford v. St. Louis & S.F.R.R., 163 Ala. 210, 50 So. 110 (1909). There are numerous other recognized exceptions to the contributory negligence doctrine. See H. Woods, supra, at § 1.6.
The sheer number of limitations on the doctrine of contributory negligence mentioned by Woods in his treatise gives witness to the patent inequity of that doctrine. I believe, as do eminent commentators, that the judicial limitations upon the contributory negligence doctrine do not properly unravel the doctrine's difficulties. Commenting on the last clear chance doctrine, Professor Prosser stated that "the whole floundering, haphazard, makeshift device operates in favor of some plaintiffs by inflicting obvious injustice upon some defendants; but it leaves untouched the greater number of contributory negligence cases in which the necessary time interval or element of discovery does not appear and the last clear chance cannot apply." Prosser, supra, at 474. I believe that we have come to a point at which we must finally recognize not only that the contributory negligence doctrine itself is unsatisfactory, but also that the "exceptions" supposedly ameliorating *1229 its unjust tendencies are likewise unsatisfactory.
This court has previously stated its willingness to consider adopting the comparative negligence analysis. In Central Alabama Elec. Coop. v. Tapley, 546 So.2d 371, 381 n. 8 (Ala.1989), this court stated in a footnote that in the proper case it would consider again the "idea of adopting the doctrine of comparative negligence." Judicial adoption of the comparative negligence analysis may become necessary due to the continuing legislative inertia on this subject.
The defendant and the Alabama Defense Lawyers Association, amicus curiae, contend that this court is not the proper forum for the adoption of this new legal standard. They argue that such a basic public policy question is best left to the legislature. I cannot agree with that contention. This court has recognized in the past that it has the inherent power to change the common law rule of contributory negligence. See Golden v. McCurry, 392 So.2d 815, 817 (Ala.1980). Other state supreme courts have also recognized their own inherent power to judicially modify negligence law. See, e.g., Gustafson v. Benda, supra, at 14.
The defendant and the amicus curiae contend that the State of Alabama legislatively adopted the common law of England in 1907 when it adopted the provision that is now codified as Code 1975, § 1-3-1. That section provides:
"The common law of England, so far as it is not inconsistent with the Constitution, laws and institutions of the state, shall, together with such institutions and laws, be the rule of decisions, and shall continue in force except as from time to time may be altered or repealed by the legislature."
The argument goes that this statute made the rationale of Butterfield v. Forrester, supra, the rule of decision in Alabama courts. Because the legislature has enacted a statute that arguably makes contributory negligence the rule of decision in this state, says the defendant, the legislature is the proper forum for the modification of that rule.
However, I note that at least 10 other American jurisdictions have judicially adopted the comparative negligence method, thus abolishing the defense of contributory negligence in those jurisdictions. See, e.g., Hilen v. Hays, 673 S.W.2d 713 (Ky.1984); Goetzman v. Wichern, 327 N.W.2d 742 (Iowa 1982) (superseded by statute); Gustafson v. Benda, 661 S.W.2d 11 (Mo.1983); Alvis v. Ribar, 85 Ill.2d 1, 52 Ill.Dec. 23, 421 N.E.2d 886 (1981); Placek v. City of Sterling, 405 Mich. 638, 275 N.W.2d 511 (1979); Bradley v. Appalachian Power Co., 163 W.Va. 332, 256 S.E.2d 879 (1979); Kaatz v. State, 540 P.2d 1037 (Alaska 1975); Li v. Yellow Cab Co., 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226 (1975); Hoffman v. Jones, 280 So.2d 431 (Fla.1973). Illinois and Iowa have since enacted comparative negligence statutes. See, e.g., Ill.Rev.St. Ch. 110 ¶ 2-1116 (1986); Iowa Code Ann. § 668.3(1) (1985).
In the Hoffman case, the Supreme Court of Florida was faced with the same situation that confronts this Court in any attempt to judicially adopt the comparative negligence method. The Hoffman court noted that Florida's legislature had enacted a statute nearly identical to our § 1-3-1, declaring that the common law of England would be the rule of decision in Florida courts. In addressing the propriety of judicially adopting the comparative negligence method, the Florida court stated:
"[W]e must also consider our own power and authority to replace the rule of contributory negligence with that of comparative negligence. It has been suggested that such a change in the common law of Florida is properly within the province only of the Legislature, and not of the courts. We cannot agree.
"The rule that contributory negligence is an absolute bar to recovery wasas most tort lawa judicial creation, and it was specifically judicially adopted in Florida in Louisville and Nashville Railroad Co. v. Yniestra, [21 Fla. 700 (1886) ]. Most scholars attribute the origin of this rule to the English case of Butterfield v. Forrester, 11 East. 60, 103 Eng.Rep. 926 (K.B.1809), although as *1230 much as thirty years laterin Raisin v. Mitchell, 9 Car. & P. 613, 173 Eng.Rep. 979 (C.P.1839)contributory negligence was held not to be a complete bar to recovery. Maloney, From Contributory to Comparative Negligence: A Needed Law Reform, 11 U.Fla.L.Rev. 135, 141-142 (1958). Although `contributory negligence' itself had been mentioned in some earlier cases, our research reveals that prior to 1809 (as well as for a time after that date) there was no clear-cut, common law rule that contributory negligence was a complete defense to an action based on negligence. Most probably, the common law was the same in this regard as English maritime law and the civil law, i.e., damages were to be apportioned when both plaintiff and defendant were at fault. See Maloney, supra, page 152. Many authorities declare that early references to `contributory negligence' did not concern contributory negligence as we are familiar with it i.e., lack of due care by the plaintiff which contributes to his injuriesbut that it originally meant a plaintiff's own negligent act which was the effective, direct cause of the accident in which he was injured. E.g., Turk, Comparative Negligence on the March, 28 Chi-Kent L.Rev. 189, p. 196 (1950).
"Prior to Butterfield v. Forrester, supra, there was no clear-cut pronouncement of the contributory negligence rule, so it must be said that `judicial thinking' culminated in the implicit pronouncement of the contributory negligence rule in the 1809 decision of Butterfield v. Forrester, supra. In view of the fact that prior to Butterfield contributory negligence was a matter of judicial thought rather than judicial pronouncement, it cannot be said that the common law was `clear and free from doubt,' so as to make it a part of the statute law of this State by virtue of Fla.Stat., § 2.01, F.S.A.
"As we stated in Duval v. Thomas, 114 So.2d 791, 795 (Fla.1959), it is `only when the common law is plain that we must observe it.' We also said in this case,
"[W]hen grave doubt exists of a true common law doctrine ... we may, as written in Ripley v. Ewell, 61 So.2d 420 (Fla.1952), exercise a `broad discretion' taking `into account the changes in our social and economic customs and present day conceptions of right and justice.'"
Hoffman v. Jones, supra, at 434-35.
It is true that this Court could await future legislative action, but to do so would be to "abdicate our own function, in a field particularly nonstatutory, when we refuse to reconsider an old and unsatisfactory court-made rule." Hoffman, supra, at 436. This court has not hesitated previously to expand common law rights. See, e.g., Ex Parte Bayliss, 550 So.2d 986 (Ala.1989) (holding that in a divorce action a trial court may order support by a noncustodial parent for education of child who has exceeded age of majority); Casrell v. Altec Industries, Inc., 335 So.2d 128 (Ala.1976) (adopting Alabama Manufacturer's Extended Liability Doctrine of products liability law with related defenses); Swartz v. United States Steel Corp., 293 Ala. 439, 304 So.2d 881 (1974) (creating right in a wife to recover for loss of her husband's consortium, a right unknown at English common law).
In Swartz, supra, this Court recognized that "judge-made" rules of law may be "judge-destroyed" without offending the tenets of § 1-3-1. Indeed, this Court is well aware of Justice Story's famous phrase: "The common law is gradually changing its old channels and wearing new." Swartz, supra, at 442, 304 So.2d 881 (quoting Story, Miscellaneous Writings at 307). I believe that our society has grown to the point that the river of common law must now cut new channels.
In adopting the comparative negligence method, I would apply the new doctrine only prospectively and not retroactively. Any case pending prior to the date of the decision adopting the comparative negligence method would still be decided under the rules of contributory negligence. However, causes accruing on or after the date of the decision adopting the comparative *1231 negligence method would be decided under the rules of comparative negligence.
For the reasons stated above, I must respectfully dissent from the Court's holding that this plaintiff was contributorily negligent as a matter of law.
JONES, J., concurs.
JONES, Justice (dissenting).
I join the Chief Justice's special opinion. See my dissent in Golden v. McCurry, 392 So.2d 815 (Ala.1980).
NOTES
[1] Because Cathy Campbell's action for loss of consortium need not be addressed separately, we shall refer to "Campbell" as meaning Larry Campbell in both his capacity as injured party and his capacity as appellant.