### A96A0416. MULLER et al. v. ENGLISH.
#### (472 SE2d 448)

SMITH, Judge.

This is a case of first impression construing the Injuries From Equine Activities Act, OCGA § 4-12-1 et seq., which provides immunity from liability for certain equine and llama activities.[1] Because the activity in question here falls within the purview of the Code section, we conclude the trial court erred in denying defendants' motion for summary judgment.

Dyna English, a rider and fox hunter of over 20 years' experience, was injured during a hunt sponsored by appellant Shakerag Hounds, Inc. English, riding her own horse, was in a small group known as the "hilltoppers" led by appellant Henry Muller. According to Muller's wife and the other riders in that small group, English was kicked by Muller's horse when she "lost control" and allowed her horse to run up "really fast" and cut between Muller and his wife, who was riding immediately behind him. According to English, she was riding along at a steady pace when Muller's horse suddenly and without warning kicked her in the leg.

English brought this action against Muller and Shakerag, seeking actual and punitive damages. Defendants answered, asserting OCGA § 4-12-3 inter alia as an affirmative defense, and moved for summary judgment on the basis of that Code section and assumption of the risk. The trial court denied summary judgment and certified the judgment for immediate review. We granted the application of Muller and Shakerag for interlocutory appeal.

1. The Injuries From Equine Activities Act, OCGA § 4-12-1 et seq., was enacted in 1991. The General Assembly made express legislative findings that "persons who participate in equine activities . . . may incur injuries as a result of the risks involved in such activities," that "the state and its citizens derive numerous economic and personal benefits from such activities," and that "[i]t is, therefore, the intent of the General Assembly to encourage equine activities . . . by limiting the civil liability of those involved in such activities." OCGA § 4-12-1.

OCGA § 4-12-3 (a) provides that "an equine activity sponsor, an equine professional . . . or any other person . . . shall not be liable for an injury to or the death of a participant resulting from the inher-

---

[1] The Act recognizes that llamas are camelids rather than equines. OCGA § 4-12-2 (8).

ent risks of equine activities," subject to certain exceptions provided in subsection (b). "Equine activity sponsor," "equine professional," "participant," and "inherent risks of equine activities" are defined in OCGA § 4-12-2. Specifically, " '[i]nherent risks of equine activities'. . . means those dangers or conditions which are an integral part of equine activities . . . including, but not limited to: (A) The propensity of the animal to behave in ways that may result in injury, harm, or death to persons on or around them; (B) The unpredictability of the animal's reaction to such things as sounds, sudden movement, and unfamiliar objects, persons, or other animals; (C) Certain hazards such as surface and subsurface conditions; (D) Collisions with other animals or objects; and (E) The potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within his or her ability." OCGA § 4-12-2 (7). English does not dispute that this incident falls within the general scope of the Act. English contends, however, either that Muller and Shakerag have failed to comply with certain conditions precedent to the Act, or that they fall under one of the enumerated exceptions to immunity.

To invoke the privileges of immunity provided by the Code section, an equine activity sponsor or equine professional must post warning signs containing the text specified in OCGA § 4-12-4 (b), and certain contracts between equine activity sponsors or equine professionals and participants must contain the same language. OCGA § 4-12-4 (a). English contends that Shakerag failed to comply with the Code because it posted "a single sign" rather than "signs" at the start of the day's hunt, and that the sign was not "conspicuously posted" because English and some other members of the hunt did not recall seeing it.[2]

The precise wording of the Code section requires only that such signs be posted "on or near stables, corrals, or arenas where the equine professional or the equine activity sponsor conducts equine activities." OCGA § 4-12-4 (a). Fox hunting, however, does not involve stables, corrals, or arenas. The undisputed testimony in this case shows that the sport is conducted across miles of open rural country, its route and distance are not predictable because they are determined by the path of the fox or other animal, and it ordinarily begins with riders conveying their horses by trailer to a "meet" in any num-

---

[2] English apparently has abandoned her contention, made at the conclusion of her deposition, that the signs "were not there." This statement, however, conflicted with her original deposition testimony that she did not *observe* any signs, and thus could not say whether they were present or not. Unexplained contradictory testimony must be construed against English on summary judgment. *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27 (343 SE2d 680) (1986).

ber of locations on the property of numerous landowners.

One of the Shakerag masters testified that she purchased seven signs before this incident.[3] She kept one or two signs in her trailer and posted five: one at the Shakerag clubhouse and the others at various locations at which the hunt frequently met. Because the hunt on the day of the incident did not begin at one of these locations, a sign was placed on a vehicle windshield. The master particularly recalled this because at the start of the meet she "advised everyone for a period of time about the Georgia law poster, that it was clearly in sight and that this was something new and that they needed to be aware of it." Moreover, English also signed a release that contained the full text of the statutory warning sign as required by OCGA § 4-12-4 (a). Substantial compliance with a statutory requirement shall be deemed sufficient. OCGA § 1-3-1 (c). Because the unique circumstances of fox hunting were not expressly contemplated by the Act, we conclude that the efforts made to post signs and the inclusion of the prescribed language in the release signed by English amounted to substantial compliance with the requirements of OCGA § 4-12-4.

2. English also relies upon certain exceptions provided in OCGA § 4-12-3 (b) to contend that Shakerag and Muller are not entitled to the immunity granted by the statute.

(a) English first asserts that Muller falls under the exception in OCGA § 4-12-3 (b) (1) (B), which makes immunity inapplicable when the "equine activity sponsor, an equine professional . . . or any other person . . . [p]rovided the animal and failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity . . . and to safely manage the particular animal based on the participant's representations of his or her ability." She contends the evidence calls into question Muller's "ability to safely manage the particular animal." This section is inapplicable by its terms because no defendant "[p]rovided the animal" to the participant, English, "based on the participant's representations of his or her ability"; she was riding her own mount.[4]

(b) English also attempts to rely on subsection (b) (2), which provides an exception when the person seeking the benefit of the statute "[o]wns, leases, rents, or otherwise is in lawful possession and control of the land or facilities upon which the participant sustained injuries because of a dangerous latent condition which was known or should

---

[3] The Act became effective on July 1, 1991. Ga. L. 1991, pp. 680, 685. This incident occurred on November 9, 1991.

[4] This exception appears to be intended for those equine professionals and activity sponsors, such as livery stables, trail rides, or riding schools, that hire or furnish horses to their customers and may be unable to verify the customer's representation of his or her skill and ability.

have been known to the equine activity sponsor, equine professional . . . or person and for which warning signs have not been conspicuously posted." She asserts that Muller's horse amounted to a "dangerous latent condition" on Muller's land, where the incident occurred. English relies on the proposition that a vicious animal "permitted . . . by careless management, to go at liberty" may constitute a dangerous condition on the property of an owner or occupier of land. *Sutton v. Sutton*, 145 Ga. App. 22, 24-25 (243 SE2d 310) (1978) (vicious bull running at large). This proposition seems inapplicable, because Muller's horse was not "at liberty." It was under the direct control of its rider and was merely passing across land owned by the rider.

We need not reach this question, however, because the exception in OCGA § 4-12-3 (b) (2) applies only to those conditions "for which warning signs have not been conspicuously posted." The text of the warning signs required by OCGA § 4-12-4 (b) explicitly refers to "the inherent risks of equine activities, pursuant to Chapter 12 of Title 4 of the Official Code of Georgia Annotated." These inherent risks include "[t]he propensity of the animal to behave in ways that may result in injury," "[t]he unpredictability of the animal's reaction" to persons and things around it, and "[t]he potential of a participant to act in a negligent manner that may contribute to injury." OCGA § 4-12-2 (7). As noted above, a warning sign was posted at the start of the hunt on the day of the incident, and English additionally signed a release that contained the statutory warning as required by the Code section.

Moreover, the construction of subsection (b) (2) urged by English would amount to a nullification of the statute with respect to the very risks for which it provides immunity where the defendant "owns, leases, rents, or otherwise is in lawful possession and control of the land or facilities upon which the participant sustained injuries." This would effectively vitiate the statute's application to most stables, riding schools, colleges, horse show sponsors, instructors, and trainers, see OCGA § 4-12-2 (5), providing immunity only for trespassers conducting equine activities on another's property without permission. "It is a basic rule of construction that a statute or constitutional provision should be construed to make all its parts harmonize and to give a sensible and intelligent effect to each part, as it is not presumed that the legislature intended that any part would be without meaning." (Citations and punctuation omitted.) *Gilbert v. Richardson*, 264 Ga. 744, 747-748 (3) (452 SE2d 476) (1994). The General Assembly could not reasonably have intended to provide immunity only for trespassers, or to base liability for equine behavior exclu-

sively on the ownership of the property where the injury occurred.[5]

(c) English next contends the exception under OCGA § 4-12-3 (b) (3) applies because Muller's conduct in riding a "vicious horse with a known propensity to kick in a fox hunt" constitutes "an act or omission that constitutes willful or wanton disregard for the safety of the participant, and that act or omission caused the injury." We disagree, because English has failed to present evidence that the horse's conduct was anything other than ordinary equine behavior, at least in the context of fox hunting.[6]

Georgia decisions have defined "willful" and "wanton" in the context of other statutory enactments as well as the common law. These definitions are essentially consistent, regardless of context. "Wilful conduct is based on an actual intention to do harm or inflict injury; wanton conduct is that which is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent." (Citations and punctuation omitted.) *Chrysler Corp. v. Batten*, 264 Ga. 723, 726 (3) (450 SE2d 208) (1994) (statute of repose in products liability). "Wilful misconduct, or wilful failure or refusal to perform a duty required by statute, is more than negligence or even gross negligence; it involves conduct of a criminal or quasi-criminal nature, the intentional doing of something, either with the knowledge that it is likely to result in serious injury, or with the wanton and reckless disregard of its probable consequences." (Citations, punctuation, and emphasis omitted.) *Wilbro v. Mossman*, 207 Ga. App. 387, 390 (1) (427 SE2d 857) (1993) (workers' compensation). See also *Cullen v. Novak*, 201 Ga. App. 459, 460 (411 SE2d 331) (1991) (award of punitive damages under OCGA § 51-12-5). "In order to prove wilful or wanton conduct, a plaintiff must demonstrate that a defendant's acts were such as to evidence a wilful intention to inflict the injury, or else were so reckless or so charged with indifference to the consequences . . . as to justify . . . finding a wantonness equivalent in spirit to actual intent." (Citations and punctuation omitted.) *McNeal Loftis, Inc. v. Helmey*, 218 Ga. App. 628, 629 (462 SE2d 789) (1995) (tortious interference with burial rights).

The evidence in the record shows without dispute that fox hunting is a very dangerous sport, over and above the inherent dangers of all equine activities.[7] English herself, an experienced rider and fox

---

[5] Had the incident here occurred a few minutes earlier or later, it would have taken place on another individual's land.

[6] We do not reach the issue of the degree of equine misbehavior which might give rise to an inference of wilful and wanton disregard in a less openly hazardous equine activity, e.g., a horse used by or near small children or novice riders. See OCGA § 4-12-3 (b) (1) (B).

[7] The unusual hazards of fox hunting have been recognized for over 150 years. See, e.g., the oft-noted comment of John Jorrocks, M.F.H.: " 'Unting . . . - it's the sport of kings, the image of war without its guilt, and only five-and-twenty per cent. of its danger." Robert

hunter, acknowledged that fox hunting was dangerous. The release that English signed at the beginning of the hunting season provides: "I fully understand that cross-country horseback riding and fox hunting (which includes riding over fences, other obstacles, and steep and rough terrain) are very dangerous activities. I wish to participate in these activities knowing they are dangerous. I accept and assume all the risks of injury (including death) to me or my property." This release also included the text of the warning required by OCGA § 4-12-4 (b).[8]

The witnesses in this action, including English, agreed that "horses do kick" and the particular risks of fox hunting include being kicked by a horse. Witness after witness testified that "in fox hunting or even anything to do with horses, the expectation is or the assumption is that a horse is going to kick," particularly when horses are galloping across country in groups, often in unfamiliar surroundings and with strange horses, and that "safe hunting distance" must be maintained to keep out of kicking range of another horse. Moreover, the witnesses' testimony is replete with accounts of kicks and injuries resulting from kicks by their own and others' horses, some in circumstances almost identical to the incident in which English was injured.

Witnesses, including English, distinguished between a horse that kicks "on occasion" and a "habitual" or "confirmed" kicker. While English acknowledges that being kicked by a horse is a particular risk in fox hunting, she contends that Muller's horse was unusual because it "has kicked numerous times." She was unable, however, to support that allegation with any evidence of specific incidents. This record reflects that Muller's horse kicked only "on occasion": that is to say, twice in two years. The testimony showed that the horse kicked out on one occasion when another horse ran into or close to it during a runaway, and on a second occasion when Muller believed another horse nuzzled or mouthed it from behind. Both these incidents occurred within approximately six months of the horse's purchase in the summer of 1989. Muller testified that in his opinion the horse was unfamiliar with the hunt field when purchased, but at the time of the incident in 1991, had been hunted for "something like" two or

---

Smith Surtees, *Handley Cross* 64 (George Bayntun 1926) (1843).

[8] We do not decide this appeal on the basis of assumption of the risk. However, the participants' knowledge of the dangers of fox hunting, as in an assumption of the risk context, is relevant to the issue of wilful or wanton conduct under OCGA § 4-12-3 (b) (3). See, e.g., *Sewell v. Dixie Region Sports Car Club*, 215 Ga. App. 611 (451 SE2d 489) (1994), involving assumption of the risks of car racing. In *Sewell* the decedent was a spectator, a category of participant expressly excluded from the Equine Activities Act. OCGA § 4-12-2 (2). English, in contrast, was an active participant whose position is more analogous to a race car *driver* in *Sewell*.

three years.

In summary, the evidence shows, and English acknowledges, that most horses "do kick," and that kicking does occur during fox hunts. Based on the evidence presented in this case, a horse intended for the sport of fox hunting that kicks out twice at other horses during the first six months of ownership, and then does not kick again for approximately one and one-half years before this incident, is not so unusually prone to kick that continuing to ride it while fox hunting is evidence of "willful or wanton disregard" for the safety of others.

Nor can we conclude that failure to adhere to such traditional fox hunting customs as tying a red ribbon in the tail of an inexperienced or irritable horse rises to the level of wilful or wanton disregard.[9] The evidence did not show the violation of any statutes, ordinances, regulations or guidelines officially adopted by any governing body of fox hunting, or indeed by Shakerag itself. In attempting to show that this custom amounts to a rule or regulation, English relies upon several sentences in a pamphlet published by a Virginia equine magazine and distributed by Shakerag to its members. Even if evidence had been presented that Shakerag by corporate action officially adopted the pamphlet, however, it still would not establish negligence. Standards or recommendations published by a private entity for use as guidelines do not create a legal requirement to comply with those standards, "and violation of such privately set guidelines, although admissible as illustrative of negligence, does not establish negligence. [Cit.]" *Manley v. Gwinnett Place Assocs.*, 216 Ga. App. 379, 380-381 (2) (454 SE2d 577) (1995) (ANSI standards). Moreover, even were it to establish *negligence*, it would not show criminal or quasi-criminal conduct, recklessness, or indifference to the consequences so as to amount to evidence of "willful or wanton disregard for the safety of the participant." OCGA § 4-12-3 (b) (3).

Finally, there was no agreement among the witnesses as to the precise meaning of a red ribbon; English herself did not testify that it necessarily denoted a kicker. She stated it "signifies that the horse could possibly be an inexperienced hunting horse, a horse that . . . the rider is not quite sure of" or a horse that might "buck or strike out," or "is just not used to going forward." Only on further questioning did she agree with her counsel that the red ribbon could "possibly" denote a horse that might kick. This lack of agreement demonstrates the danger of relying upon privately established standards or recommendations to establish negligence; moreover, as revealed in

---

[9] While English disputed the testimony of other witnesses that Muller's horse was wearing a red ribbon on the day of the incident, this dispute is not material.

this record, the number of hunting customs and the disagreement as to their meaning make it particularly unwise to rely upon them to establish wilful and wanton conduct.[10] This evidence is insufficient as a matter of law to support a finding that Muller's or Shakerag's conduct manifested a "willful or wanton disregard" for English's safety.

The evidence adduced in the trial court demonstrates that appellants fall within the scope of the Injuries From Equine Activities Act, properly invoked the privileges of immunity provided by that Act, and are subject to no exception established by the Act. Accordingly, the trial court erred in denying summary judgment.

3. Because we conclude that the trial court should have granted appellants' motion for summary judgment on the basis of immunity under OCGA § 4-12-3, we need not consider appellants' contention that they were entitled to summary judgment on the basis of English's assumption of the risk.

*Judgment reversed. Pope, P. J., and Andrews, J., concur.*

DECIDED MAY 22, 1996 —
RECONSIDERATION DENIED JUNE 10, 1996 

*Lord, Bissell & Brook, James H. Wynn,* for appellants.
*Boone, Papadakis & Levine, James J. Gormley III,* for appellee.

---

[10] This is particularly true since equal weight is often given to rules based solely in tradition and custom rather than any recognizable safety concern. Traditionally, writers on "hunting rules" make little if any distinction between such matters as warning other riders of hazards, precedence at jumps or gaps, disturbing hounds, "eccentricity of dress," or putting a colored browband on a horse's bridle. See, e.g., M. F. McTaggart, *The Art of Riding* 105-108 (4th ed. 1934); Belle Beach, *Riding and Driving for Women* 58-63 (1912).