**FIRST DIVISION
ELLINGTON, C. J.,
PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**July 13, 2012**

# In the Court of Appeals of Georgia

A12A0408. MAYS et al. v. VALLEY VIEW RANCH, INC.

PHIPPS, Presiding Judge.

Evangeline Mays was injured when a portion of a horse hitching rail fell upon the fourteen-year-old during her stay at a summer equestrian boarding camp for girls ages eight to seventeen. The camp was owned and operated by Valley View Ranch, Inc. Sammie Mays, individually and as Evangeline Mays's mother and guardian, (hereinafter, the Mayses) sued Valley View Ranch for damages. Valley View Ranch filed a motion claiming, inter alia, that it was entitled to civil immunity under Georgia's Injuries From Equine Or Llama Activities Act (the Act).[1] Agreeing therewith, the trial court granted the motion. The Mayses challenge that ruling on appeal, but have shown no error. We affirm.

---

[1] OCGA § 4-12-1 et seq.

On July 3, 2008, Evangeline Mays was preparing to go on a trail ride with her fellow campers and camp counselors. She retrieved from the barn her assigned horse, Depp, and led him to a nearby hitching rail for horse grooming and tacking up.

The hitching rail was made of wooden utility poles. A single horizontal rail (an 18-foot-long, 300-pound pole with its ends notched) was positioned such that each (notched) end lay flat atop a vertical post (a pole that measured approximately 37.5 inches above ground). At each end of the horizontal rail, a 12-inch spike had been driven through the horizontal rail and about 6 inches into the respective vertical post underneath.

Each camper had been instructed by Valley View Ranch personnel to keep her horse at the hitching rail during the grooming and tacking process by wrapping the horse's lead rope around the horizontal rail between one and three times. Accordingly, Evangeline Mays wrapped Depp's lead rope around the horizontal rail about two times. Another horse, Chase, was already so "hitched" to the horizontal rail.

Evangeline Mays groomed Depp, then put the saddle pad on him. As she was standing between Depp and Chase and holding the saddle and the bridle, Evangeline Mays deposed, Chase made a loud squealing noise and began thrashing her head

about; the horse started "backing up really hard and getting her head up and she couldn't get away." Chase's "feet were going everywhere. She was completely panicked."

Depp also started backing up, kicking, bucking, and trying to rear up. According to Evangeline Mays, "[Depp and Chase] were trying to get away from the pole. That seemed to be like their problem." She described that the horses were "flailing their back feet, pushing them outward"; "[t]hey were kicking out with their back feet, pulling their front feet up, pawing out, pawing in, just scooting every which way." The horses were "thrashing and trying to pull backwards," and they were also "going from side to side." The horses behaved this way, Evangeline Mays estimated, for a minute and a half to two minutes.

Still between Depp and Chase when the horses' rear ends were almost touching, Evangeline Mays attempted to escape the situation by diving underneath the hitching rail. At that precise moment, the horizontal rail separated from one of its vertical posts and bounced upon and broke Evangeline Mays's foot. Evangeline Mays lay on the ground; Chase bolted; Depp stood by quietly, as his rope remained attached to the fallen horizontal rail.

In their action against Valley View Ranch, the Mayses alleged theories of negligence. They complained that the hitching rail was defectively constructed. They complained that Valley View Ranch should have provided for its campers to use cross-ties or tie-ropes with "quick release" capabilities, rather than instructing them to wrap the lead ropes around the hitching rails. Among its defenses, Valley View Ranch argued in its motion that, under the Act, it was shielded from civil liability on all the Mayses' claims.

In the Act, the General Assembly recognizes that persons who participate in equine activities may incur injuries as a result of the risks involved in such activities, and found also that the state and its citizens derive numerous economic and personal benefits from such activities.[2] The Act thus sets forth the General Assembly's intent: "to encourage equine activities . . . by limiting the civil liability of those involved in such activities."[3] To that end, OCGA 4-12-3 (a) of the Act states that, save specified exceptions, "an equine activity sponsor, an equine professional, . . . or any other person, which shall include a corporation or partnership, shall not be liable for an

---

[2] OCGA § 4-12-1.

[3] OCGA § 4-12-1.

4

injury to or the death of a participant resulting from the *inherent risks of equine activities*."[4]

In this appeal, the Mayses contend that the trial court erred in concluding that the Act barred Valley View Ranch from being held liable on their negligence action.[5] They maintain that OCGA § 4-12-3 (a) did not preclude civil liability because their claims were not premised upon the "inherent risks of equine activities," pointing out that no horse kicked, struck, or otherwise came into contact with Evangeline Mays's person in any harmful way. Alternatively, the Mayses argue that the trial court erred in rejecting their position that their claims fell within specified exceptions to OCGA § 4-12-3 (a)'s grant of civil immunity. In addition, they contend that the contract signed by Evangeline Mays's mother, Sammie Mays, which allowed Evangeline Mays to attend the equestrian camp, was ineffective such that the Act's immunity was

---

[4] (Emphasis supplied.) There is no dispute on appeal that Valley View Ranch constitutes "an equine activity sponsor, an equine professional, . . . or any other person, which shall include a corporation or partnership" for purposes of OCGA § 4-12-1. Nor is there any dispute that, in attaching the horse to the hitching rail, grooming Depp, and tacking up the horse, Evangeline Mays was involved in an equine activity under that Code section.

[5] See generally *Cameron v. Lang*, 274 Ga. 122, 124 (1) (549 SE2d 341) (2001) (usually, whether person is immune from civil liability is a question of law).

not invoked.[6] Consequently, the Mayses claim, genuine issues of material fact remain as to their negligence action. We consider each of these contentions in turn.

1. The Mayses contend that their negligence action is not barred under OCGA § 4-12-3 (a) because Evangeline Mays's injuries did not result from the "inherent risk of equine activities." According to the Mayses, Evangeline Mays's foot was injured, not by any horse itself, but from a falling hitching rail. They argue that "[a] hitching rail's collapse is not an inherent risk of equine activity" and that nothing in the Act dispenses with a property owner's duties to comply with Georgia laws concerning premises liability and construction.

"In effect, [the Mayses] read[ ] '[inherent risks of equine activities]' to mean only the activity *of* equine animals, not activity *involving* equine animals."[7] But the Mayses' restrictive proffer contradicts the broad definition set out by the General Assembly. OCGA § 4-12-2 (7) defines "inherent risks of equine activities" to mean

---

[6] The Act provides that failure to comply with specified warning requirements in written contracts prevents an equine activity sponsor or equine professional from invoking the privileges of immunity. OCGA § 4-12-4.

[7] *Loftin v. Lee*, 341 SW3d 352, 357 (II) (Tex. 2011) (emphasis in original). *Loftin* was decided under an immunity act with language similar to that of Georgia's Act.

"those dangers or conditions which are an integral part of equine activities," including, but not limited to:

> (A) The propensity of the animal to behave in ways that may result in injury, harm, or death to persons on or around them; (B) The unpredictability of the animal's reaction to such things as sounds, sudden movement, and unfamiliar objects, persons, or other animals; (C) Certain hazards such as surface and subsurface conditions; (D) Collisions with other animals or objects; and (E) The potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within his or her ability.[8]

While some of the examples concern only animal propensities and behavior, others – e. g., those examples naming hazards such as surface and subsurface conditions and collisions with objects – reveal that the animal's interaction with even static conditions or objects may fall within the statutory definition of "inherent risks of equine activities."[9]

Even the Mayses' principal witness on horse handling and safety deposed that horses can become startled – unpredictably and for no obvious reason; that when

---

[8] OCGA § 4-12-2 (7) (A-E).

[9] See generally *Loftin*, supra at 357 (III).

startled, the animals' survival instinct causes them to bolt; that as prey animals, they use strength, stamina, agility and speed to escape perceived danger; that most horses tied or fastened to something will "pull back and also rear up"; and that when frightened, the animals can damage things nearby. Here, it is undisputed that, while in the process of tacking up a horse that was attached to a hitching rail, Evangeline Mays was injured when that horse and another horse attached to the same hitching rail suddenly and unpredictably became startled, thereupon kicking, bucking, and thrashing about for approximately a minute and a half to two minutes in an apparent attempt to pull free of the hitching rail, which caused the horizontal rail to separate from one of its vertical posts and fall upon and break her foot. Contrary to the Mayses' position, these circumstances established that Evangeline Mays's injury resulted from the "inherent risks of equine activities" as contemplated by OCGA § 4-12-2 (7).[10] Therefore, OCGA § 4-12-3 (a) provided Valley View Ranch with civil immunity from the Mayses' claims, unless an exception to that Code provision's grant of immunity applied.

---

[10] See generally id. See generally also *Adams v. Hare*, 244 Ga. App. 605, 607-608 (1) (536 SE2d 284) (2000) (where plaintiff was injured by horse's kick, injury resulted from inherent risks of equine activities and not, as plaintiff claimed, from misrepresentations in the sale of the horse).

2. The Mayses contend that their claims fell within exceptions set forth in OCGA § 4-12-3 (b).

(a) We consider first OCGA § 4-12-3 (b) (2), which pertinently provides that nothing in OCGA § 4-12-3 (a) shall prevent or limit the liability of an equine activity sponsor, an equine professional, or any other person if the equine activity sponsor, equine professional, or person:

> [o]wns, leases, rents or otherwise is in lawful possession and control of the land or facilities upon which the participant sustained injuries because of *a dangerous latent condition which was known or should have been known* to the equine activity sponsor, equine professional, . . . or person and for which warning signs have not been conspicuously posted.[11]

To support their negligence claim that the hitching rail was defectively constructed and thus amounted to a dangerous latent condition, the Mayses presented the opinions of a retired college professor of animal science who had taught subjects such as horse handling and safety. According to the professor, a single 12-inch spike should not have been used to attach each end of the horizontal rail to the vertical post underneath; rather, a single 12-inch lag screw, coupled with "banding" with a "metal

---

[11] (Emphasis supplied.)

9

strap of some type such as roof flashing or perforated pipe hanger iron," should have been used at each end. Additionally, the professor opined, the vertical posts were set too far apart; the distance should not have exceeded 10 feet. The professor opined also that the horizontal rail was too low; it should have been positioned at least 42 inches above ground.

The individual who had owned and operated the ranch as a girls' equestrian summer camp for approximately 40 years had collaborated with the individual who had performed maintenance work at the ranch since 1998 in deciding on the materials, design, and construction of the hitching rail; the maintenance worker had built it accordingly. Banding had been considered, but the owner/operator decided against adding that, concerned that a child's finger could get stuck under it.

While the evidence showed that the hitching rail failed to withstand the force of the two horses and showed also that Valley View Ranch knew precisely how the hitching rail had been constructed, application of the cited exception required a showing of "a dangerous latent condition which was known or should have been known" to Valley View Ranch.[12] The record fails to demonstrate, however, that Valley View Ranch had actual knowledge that the condition of the hitching rail was

[12] See OCGA § 4-12-3 (b) (2).

10

dangerous. Both the owner/operator and the maintenance worker testified that they knew nothing about either the hitching rail at issue or any others at the ranch that were similarly constructed coming apart prior to the date of the incident. Moreover, at the start of each summer camp, the hitching rails were inspected by the maintenance worker. As part of his inspection, he would push, pull, bump, and manipulate the hitching rails. None had shown any indication of instability; and at no time had he observed any spike that had "backed out" of its horizontal rail, or any rail that had separated from a vertical post in any way. Furthermore, the individual who served as barn manager in charge of the horses and who also supervised the camp counselors who gave riding lessons to the campers testified that, on numerous occasions prior to the underlying incident, she had seen horses trying to pull away from the hitching rail in question; the hitching rail had not moved, but had remained secure.

Nor does the record demonstrate that Valley View Ranch should have known that the hitching rail, so constructed, was a dangerous latent condition. Negligent construction claims arise "from breach of a duty implied by law to perform the work

in accordance with industry standards."[13] "[E]xpert testimony as to the practices of an industry are acceptable. This would include an expert's reliance [on such documents as] a Code used as the safety standard for an industry in forming his opinion."[14] But the Mayses failed to show that the opinions of the professor amounted to industry standards or practices such that the hitching rail constituted a dangerous latent condition that should have been known to Valley View Ranch.

To be sure, the professor was asked during his deposition to identify applicable industry standards upon which his opinions were based. Although he revealed that he had consulted a United States Department of Transportation's publication entitled "Equestrian Design Guidebook for Trails, Trailheads and Campgrounds," the professor conceded that this publication was a mere guide that could be accepted or rejected. The professor revealed that his opinions had stemmed also from a publication: "Certified Horsemanship Association [CHA], Standards for Group Riding Program." But, as the professor acknowledged, that publication set forth as "[a]n important note regarding the purpose of the CHA standards:"

---

[13] *City of Atlanta v. Benator*, 310 Ga. App. 597, 605 (5) (714 SE2d 109) (2011) (punctuation omitted).

[14] *Thomas v. MARTA*, 300 Ga. App. 98, 103 (2) (b) (684 SE2d 83) (2009) (punctuation and footnote omitted).

CHA does not mean to suggest that these are the only ways in which to promote safety. Nor does CHA suggest or infer that those who do not follow these standards or recommendations engage in unsafe practices. These standards are not intended to give rise to duties of care.[15]

The professor was asked about his specific opinions. Regarding the minimum required height of the hitching rail, he could point to no industry standard, rule, regulation, or statute; regarding the length of the hitching rail, the professor testified that there was no regulation or even a recommendation. The professor cited nothing indicating that lag screws (as opposed to spikes), coupled with banding, were the industry standard. And he cited nothing so limiting the distance allowed between vertical posts.

Nor does the record support an inference that the hitching rail was defectively constructed based on industry practices. In reaching his opinions, the professor had not conferred with any fellow professor or builder. And upon his visits to numerous farms, he had noticed wide variety in the construction of hitching rails. There were differences in heights of the horizontal rail, spacings between vertical posts, and the

---

[15] See generally *Muller v. English*, 221 Ga. App. 672, 678 (2) (c) (472 SE2d 448) (1996) (standards or recommendations published by a private entity for use as guidelines do not create a legal requirement to comply with those standards).

manners in which the horizontal rails were attached to the vertical posts. For example, some used spikes, whereas others used screws; some attachments included banding; others did not. The professor acknowledged observing hitching posts like the one at issue here, with a single spike and no banding.

Given the foregoing, no evidence was adduced that the hitching rail, as constructed, constituted "a dangerous latent condition which was known or should have been known" to Valley View Ranch.[16]

(b) The Mayses cite the civil immunity exception set forth in OCGA § 4-12-3 (b) (1) (A). It pertinently provides that nothing in OCGA § 4-12-3 (a) prevents or limits the liability of an equine activity sponsor, an equine professional, or any other person if the equine activity sponsor, equine professional, or person "[p]rovided the equipment or tack, and knew or should have known that the equipment or tack was

---

[16] See generally *MARTA v. Rouse*, 279 Ga. 311, 314 (1) (612 SE2d 308) (2005) (even defendants chargeable with extraordinary care are not required to utilize the newest and safest equipment to escape liability, for to hold otherwise would essentially force them to be insurers of the safety of others); *Hamblin v. City of Albany*, 272 Ga. App. 246 (612 SE2d 69) (2005) (although plaintiff who injured her hand on wooden handrail at outdoor park presented testimony about the effects of pressure washing and applying a urethane coating upon wood, she provided no evidence that an ordinarily prudent owner or operator of an outdoor establishment would have applied such a coating to wooden handrails installed outside and would not have pressure washed them; thus, plaintiff failed to show that the park owner's and operator's maintenance of the handrail created a dangerous condition).

faulty, and such equipment or tack was faulty to the extent that it did cause the injury."

(i) The Mayses contend that the hitching rail constituted "equipment" that was faulty. The Act does not define "equipment" and there is no Georgia decision interpreting that word within the context of the cited exception. Assuming for the sake of argument that the hitching rail constituted "equipment," there is no evidence that Valley View Ranch knew or should have known that it was faulty.[17]

(ii) The Mayses assert that Valley View Ranch used equipment that was faulty in that it failed to provide for tie ropes with quick release capability and instead instructed the campers to wrap the horses' lead ropes around the horizontal rails between one and three times.[18] The Mayses rely on the professor's testimony that, in the event of an emergency, a tie rope could be released quickly either from the fixture or the horse halter.

---

[17] See Division (2) (a), supra.

[18] Urging an expansive definition of "faulty" equipment, the Mayses cite *Teles v. Big Rock Stables, LP*, 419 FSupp2d 1003, 1007 (III) (A) (E.D. Tenn. 2006), in which the definition of "faulty" equipment was interpreted to include improper use of stirrups. Statutory language at issue in *Teles* was similar to that of Georgia's Act. See *Teles*, supra.

The professor revealed that his opinion was based on the publication: "Certified Horsemanship Association, Standards for Group Riding Program." As noted above, the professor conceded that the publication was expressly not meant to suggest the only ways in which to promote safety; nor was it intended to suggest that those who do not follow its recommendations engage in unsafe practices.

Furthermore, the owner/operator of the ranch testified that she was familiar with quick release knots, but had decided against them because the knots could tighten and become impossible for eight- to seventeen-year-old girls to release if a horse began pulling back on them. She explained that, when a camper has instead simply wrapped the lead rope around the rail, "[the camper] can just unwrap. And if the horse does that by himself, it is fine. They're just going to go get a bit of grass or something." The individual who served as barn manager and supervisor of camp counselors providing riding lessons described that the goal of wrapping the lead rope a few times around the horizontal rail was not to tie the horse to the rail, but rather to provide a "visual barrier and deterrent" for the horse.

The professor conceded the difficulties associated with deploying a "quick release tie" on a startled horse: if a camper's horse was "rearing on its hind quarters, pulling up and back and [it's] elevated, that can be a potentially dangerous thing to

do for an 8 year-old up to a 17-year-old." The professor was thus asked, "[W]hat if a horse is not tied, but simply the lead rope is looped over one or two times, what if the intent is not to tie the horse to the hitching post, the hitching rail, but rather just to keep it there while the tack is being placed on the horse, do you find criticism with that?" The professor answered, "If that's the intent, no, I don't find criticism with it. If the intent is not to have the horse tied, and that's how they saddle that horse, I don't have criticism with that."

Given the foregoing, even assuming for the sake of argument that failure to provide for quick release ties *could* constitute "faulty" equipment as urged by the Mayses,[19] the Mayses failed to show that Valley View Ranch's decision not to provide for "quick release" ties while Evangeline Mays was tacking up her horse was an instance thereof.

3. The Mayses contend that Valley View Ranch failed to avail itself of the immunity allowed under the Act, asserting that the release, which Sammie Mays admittedly read and signed for Evangeline Mays to attend the equestrian camp, was ineffective.

---

[19] See footnote 18, supra.

Pertinent here is that OCGA § 4-12-4 requires every written contract entered into by an equine professional or by an equine activity sponsor for the providing of professional services, instruction, or the rental of equipment or tack or an equine to a participant to contain a specified warning notice.[20] Failure to comply with that requirement "shall prevent an equine activity sponsor or equine professional from invoking the privileges of immunity provided by this [Act]."[21]

Because the release contained the requisite warning, the Mayses' contention is without merit.

4. Finally, applicability of the immunity afforded Valley View Ranch by the Act renders moot the Mayses' remaining contention that genuine issues of material fact exist with respect to the elements of their substantive claims.[22]

*Judgment affirmed. Ellington, C. J., and Dillard, J., concur.*

---

[20] OCGA § 4-12-4 (a), (b).

[21] OCGA § 4-12-4 (c).

[22] *Wiederkehr v. Brent*, 248 Ga. App. 645 (548 SE2d 402) (2001) (affirming grant of summary judgment to defendant on basis that defendant had immunity pursuant to Injuries From Equine Or Llama Activities Act, despite genuine issues of material fact on substantive claims); accord *Cameron*, supra (immunity is an "entitlement not to stand trial" rather than a "mere defense to liability").