DONALDSON, Judge.
Chad Estes, as parent and next friend of A.G.E., a minor, appeals from a summary judgment of the Shelby Circuit Court (“the trial court”) in favor of Stepping Stone Farm, LLC (“Stepping Stone”),[1] Courtney Huguley, and Melissa Croxton (hereinafter referred to collectively as “the defendants”). This case involves the question whether persons and a business engaged in equine[2] activities are entitled to immunity from liability under the Equine Activities Liability Protection Act (“the Equine Act”), codified at § 6-5-337, Ala.Code 1975, in a personal-injury action brought by a parent whose child suffered injuries in a horseback-riding incident. Under the facts presented, we hold that the defendants are entitled to the immunity, and, thus, we affirm the trial court’s judgment.

Facts and Procedural History

On August 30, 2011, Estes, as parent and next friend of A.G.E., a minor, initiated the underlying action against the defendants, asserting claims of negligence, wantonness, and negligent failure to train or supervise arising from a horseback-riding incident on June 27, 2010, when A.G.E. suffered injuries while falling from a horse.
On August 14, 2012, the defendants filed a motion for a summary judgment, with supporting materials, asserting that there were no genuine issues of material fact and that they were entitled to a judgment as a matter of law. In their motion for a summary judgment, the defendants’ sole *302 contention was that they were immune from liability for A.G.E.’s injuries under the Equine Act. The evidentiary submissions in support of and in opposition to the motion for a summary judgment reveal the following facts. Stepping Stone is a business that offers horse training in Shelby County. Huguley is the sole member of Stepping Stone. She also works as an instructor for Stepping Stone. Occasionally, Croxton, a former student of Huguley’s, works for Stepping Stone as a riding instructor. Stepping Stone occasionally allows clients of the business to host birthday parties at its facilities where attendees participate in horseback-riding activities. On June 27, 2010, Croxton and two other individuals were working at a birthday party being held at Stepping Stone’s facilities. A.G.E., who was 4 years old at the time, attended the party accompanied by Estes, her father. Before any horseback-riding activities took place, Croxton provided instructions to everyone in attendance concerning horseback-riding safety procedures and precautions, including instructions on behavior around the horses. Because Estes and A.G.E. were late arriving to the event, they were not present for the instructional session conducted by Croxton. Other birthday-party attendees were already riding horses when Estes and A.G.E. arrived.
Estes claimed that, after arriving at Stepping Stone’s facilities, he introduced himself to Croxton. He stated that he observed children riding horses in a horse pen and that he then walked away from the pen to talk with other adults at the party. When he returned to the pen, Estes claimed, he saw A.G.E. on a horse with A.G.E.’s aunt. Estes claimed that A.G.E.’s aunt was going to get off of the horse and Estes was going to get onto the horse to ride with A.G.E. Estes claimed that Croxton led the horse by the reins over to him and the aunt dismounted the horse leaving only A.G.E. on the horse. Estes claimed that he attempted to get on the horse but that he could not do so because the stirrups were too short. According to Estes, Croxton then let go of the reins and moved from the front of the horse to the saddle area to adjust the stirrups. Estes claimed that the horse then became startled by another horse and bolted. Estes further claimed that Crox-ton grabbed A.G.E.’s leg and pulled her off of the horse, resulting in the child’s being injured.
Croxton confirmed that safety instructions were given to the birthday-party attendees at the beginning of the party and that some of the instructions included how to act or behave around the horses. Crox-ton asserted that, on the day of the party, she observed A.G.E. on top of a horse along with another adult attending the party. Croxton stated that A.G.E. was incorrectly positioned on the horse. Estes testified he was unaware who had placed the child on the horse, but Croxton claimed that Estes had placed A.G.E. on the horse. Croxton claimed that she approached the horse that A.G.E. was on to intervene and correct A.G.E.’s position on the horse. Croxton stated that, when she reached the horse, she grabbed the reins with one hand and placed her other hand on A.G.E.’s leg. She testified that A.G.E. was crying. Croxton said that she told A.G.E. that “we needed to adjust her stirrups to her length if she wanted to stay on the horse and that we needed to try not to cry so much because it could scare the horse.” Croxton testified that A.G.E. “never responded. She just cried.” Crox-ton testified that, before she could make the proper adjustments to the stirrups, the horse was startled by the presence of another horse and began running while A.G.E. was still on the horse. Croxton claimed that the actions of the horse pulled *303 the reins out of her hand and that Crox-ton’s other hand was pulled from A.G.E.’s leg. Croxton claimed that A.G.E. then fell off the right side of the horse and onto the ground. Estes took A.G.E. for immediate medical treatment at Children’s Hospital in Birmingham for injuries to A.G.E.’s head.
The evidentiary submissions in support of the summary-judgment motion show that a sign was present in the stable located at Stepping Stone’s facilities on the date of the incident. The sign contained the following language: “Under Alabama law, an equine activity sponsor or equine professional is not liable for an injury to or the death of a participant in equine activities resulting from the inherent risks of equine activities, pursuant to the Equine Activities Liability Protection Act.” Testimony indicates that the letters on the sign were at least one inch in height. Estes testified that he did not see the sign when he was at Stepping Stone’s facilities. Estes was not provided with any written materials from Stepping Stone regarding the information on the sign, nor was he asked' to sign any documents waiving liability. Although Estes claimed that he introduced himself to Croxton when he arrived, there was no evidence presented to the trial court as to whether Croxton was aware that Estes and A.G.E. were not present for the introductory instructions. Further, there was no evidence presented to the trial court as to whether Estes’s or A.G.E.’s receiving those instructions would have prevented the incident or injuries to A.G.E.
The trial court held a hearing on the summary-judgment motion on November 8, 2012. On January 7, 2013, the trial court granted the motion and entered a summary judgment in favor of the defendants. Estes filed a timely appeal to our supreme court. This case was transferred to this court by the supreme court, pursuant to § 12-2-7(6), Ala.Code 1975.
On appeal, Estes does not argue that the summary judgment was erroneously entered with respect to the claims of negligent failure to train or supervise, nor does he argue that the judgment entered in favor of Huguley on these claims should be reversed.

Standard of Review

“This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12. ‘[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assur. Co. of Fla., 547 So.2d 870, 871 (Ala.1989).”
Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004).

*304
Analysis

Pursuant to the Equine Act, individuals and entities engaged in equine activities. are provided with extensive immunity from liability for personal injuries resulting from those activities. The Alabama Legislature specifically expressed this intent in adopting the Equine Act, stating:
“The Legislature recognizes that persons who participate in equine activities may incur injuries as a result of the risks involved in those activities. The Legislature also finds that the state and its citizens derive numerous economic and personal benefits from equine activities. The Legislature finds, determines, and declares that for the immediate preservation of the public peace, health, and safety, and to encourage equine activities, this legislation is to limit the civil liability of those involved in equine activities.”
§ 6-5-337(a). “Equine activity” is defined to include horseback riding, “whether or not the owner has received some monetary consideration or other thing of value for the use of the equine.” § 6-5-337(b)(3)d. Section 6-5-337(c)(l), the immunity clause in the Equine Act, establishes that
“an equine activity sponsor, an equine professional, or any other person, which shall include a corporation or partnership, shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine activities and, except as provided in subdivisions (c)(2) and (c)(3), no participant or representative of a participant shall make any claim against, maintain an action against, or recover from an equine-activity sponsor, an equine professional, or any other person for injury, loss, damage, or death of the participant resulting from any of the inherent risks of equine activities.”
The term “equine activity sponsor” is defined to include,
“[a]n individual ... or corporation ... which sponsors, organizes, or provides the facilities for an equine activity, including, but not limited to: ... riding clubs ... and operators, instructors, and promoters of equine facilities, including, but not limited to, stables, clubhouses, ... and arenas at which the activity is held.”
§ 6-5-337(b)(4). An “equine professional” is defined to include “[a] person engaged for compensation in ... [¡Instructing a participant or renting to a participant an equine for the purpose of riding, driving, or being a passenger upon the equine.” § 6-5-337(b)(5)a. The Equine Act defines “inherent risks of equine activities” to include:
“Those dangers or conditions which are an integral part of equine activities, including, but not limited to:
“a. The propensity of an equine to behave in ways that may result in injury, harm, or death to persons on or around them.
“b. The unpredictability of the reaction of an equine to sounds, sudden movement, and unfamiliar objects, persons, or other animals.
“c. Certain hazards such as surface and subsurface conditions.
“d. Collisions with other equines or objects.
“e. The potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within his or her ability.”
§ 6-5-337(b)(6).
The immunity provided for in the Equine Act, however, is not absolute; *305 rather, the Equine Act provides, in pertinent part, that
“[njothing in subdivision [§ 6-5-837](c)(l) shall prevent or limit the liability of an equine-activity sponsor, an equine professional, or any other person if the equine-activity sponsor, equine professional, or person:
[[Image here]]
“b. Provided the equine and failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity and to safely manage the particular equine based on the participant’s representations of his or her ability.
[[Image here]]
“d. Commits an act or omission that constitutes willful or wanton dis-. regard for the safety of the participant, and that act or omission caused the injury.”
§ 6-5-387(c)(2). Further, the Equine Act requires an equine professional and an equine-activity sponsor to post a warning sign “in a clearly visible location on or near stables, corrals, or areas where the equine professional or the equine-activity sponsor conducts equine activities” and that the statutorily prescribed warning “shall appear on the sign in black letters, with each letter to be a minimum of one inch in height.” § 6-5-337(d)(l). The Equine Act provides that the warning shall consist of the following language: “Under Alabama law, an equine activity sponsor or equine professional is not liable for an injury to or the death of a participant in equine activities resulting from the inherent risks of equine activities, pursuant to the Equine Activities Liability Protection Act.” § 6-5 — 337(d)(2). Similarly, the Equine Act requires that every written contract entered into by an equine professional or by an equine-activity sponsor involving equine service and instruction contain the aforementioned warning language. The Equine Act further provides that the “[fjailure to comply with the requirements concerning warning signs and notices provided in this section shall prevent an equine-activity sponsor or equine professional from invoking the privileges of immunity provided by this section.” § 6-5-337(d)(3).
In the present case, based on the materials submitted by the defendants in support of their summary-judgment motion, there is no dispute that, for the purposes of the Equine Act, Stepping Stone and Huguley are “equine activity sponsors”; that Croxton is an “equine professional”; or that the Estes, A.G.E., and the defendants were engaged in “equine activities” on June 27, 2010. The defendants properly supported their motion for a summary judgment with materials establishing their claims of immunity. Therefore, unless Estes can establish either that the immunity defense is not applicable or that an exception to that defense is applicable, the summary judgment in favor of the defendants should be affirmed. See, e.g., Ryan v. Hayes, 831 So.2d 21 (Ala.2002) (citing Ex parte Davis, 721 So.2d 685 (Ala.1998))(holding that, once a defendant established that State-agent immunity attached, the burden shifted to the plaintiff to establish that an exception to the immunity was applicable). Estes does not contest that the Equine Act applies. Instead, he contends that the trial court erred in entering summary judgment because, he asserts, there are genuine issues of material fact regarding (1) whether the defendants failed to make reasonable and prudent efforts, thereby implicating the exception to immunity in § 6 — 5—337(c) (2)b; (2) whether Croxton acted with willful or wanton disregard for the safety of A.G.E.; and/or (3) whether the defendants failed to provide Estes and A.G.E. with an ade *306 quate warning, as required by § 6-5-337(d). The application of one of the exceptions to immunity under the Equine Act does not establish strict liability of a defendant. If an exception to immunity applies, the statutory immunity to liability is removed; however, the plaintiff must still establish the liability of the defendant.
In order for the § 6 — 5—337(c)(2)b exception to immunity to apply, the defendants must have provided the horse to A.G.E. while failing to make reasonable and prudent efforts to determine her riding ability to engage safely in horseback riding and to safely manage the particular horse she was riding based on the representations regarding A.G.E.’s ability. Because the facts must be viewed in the light most favorable to Estes for purposes of our review, Dow, 897 So.2d at 1038, we will assume a genuine issue of fact existed as to whether Stepping Stone and/or Croxton “provided” the horse to A.G.E. by making it available for A.G.E. to ride at the party. To establish this exception to immunity, the evidence must also show that a defendant “failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity and to safely manage the particular equine based on the participant’s representations of his or her ability.” § 6-5-337(c)(2)b.
The phrase “reasonable and prudent efforts” is not defined in the Equine Act, and the Equine Act does not specify what actions an equine-activity sponsor or an equine professional must take to constitute “reasonable and prudent efforts.” One such action or effort, although not the only action or efforts, could be an oral inquiry of the participant to ascertain his or her riding ability. In their motion for a summary judgment, the defendants asserted that Croxton had no opportunity to determine A.G.E.’s ability to safely engage in the horseback-riding activity because Estes and A.G.E. were late and missed the introductory instructions. In response, Estes presented his own testimony that Croxton saw him and A.G.E. arrive, implying that she could have made inquiries of A.G.E.’s riding ability at that time. This evidence, when viewed most favorably to Estes, establishes a genuine issue of fact as to whether Croxton had an opportunity to make specific inquires concerning A.G.E.’s riding ability.
However, the defendants also asserted in their motion for a summary judgment that the § 6-5-337(c)(2)b exception to immunity does not apply because the ability of A.G.E. to ride the horse was not a cause of the accident. Stated otherwise, they assert that the immunity exception is not applicable to these facts because, they say, the evidence does not establish a genuine issue of material fact as to whether any alleged failure to identify the abilities of A.G.E. to safely manage the horse caused the accident or injuries. We agree. In the complaint, Estes alleged that the defendants “failed to ensure proper safety measures and/or protocol was followed at a child’s birthday party in which stable sponsored horse rides were provided.” Regarding the causation of A.G.E.’s injuries, Estes alleged as follows in the complaint:
“12. Sometime during the party, minor child A.G.E. was placed upon a full grown stallion under the care and control Defendant Melissa Croxton, an employee and or agent of Stepping Stone Farm.
“13. Defendant Croxton failed to maintain custody and control of the stallion upon which the minor child (‘A.G.E.’) was sitting. The horse bolted from the arena at a dead run causing A.G.E. to fall from the stallion and strike the ground resulting in severe injury, *307 A.G.E., was then trampled by the animal.”
In support of their motion for a summary judgment, the defendants presented unrefuted testimony that neither Croxton nor anyone acting on behalf of Stepping Stone placed A.G.E. on the horse; that Croxton noticed that A.G.E. was on top of the horse; that Croxton took the reins and control of the horse when she first saw that A.G.E. was incorrectly positioned on the horse; that, before Croxton could make adjustments to the stirrups for A.G.E., the horse became spooked and bolted; that Croxton attempted to stop the horse but the reins were pulled from her hands; and that the child fell from the horse as the horse continued to run. There was no evidence presented indicating that A.G.E.’s incorrect positioning on the horse was a cause of the accident, and no evidence indicated that A.G.E.’s riding ability or Croxton’s alleged failure to assess A.G.E.’s riding ability were a cause of the accident. In their summary-judgment motion, the defendants contended that A.G.E.’s injuries were caused solely by the horse reacting in a sudden and unexpected way that caused A.G.E. to fall off the horse, which is an inherent risk of equine activities, as defined in § 6 — 5—337(b)(6).
Estes does not dispute that the horse became startled, and he did not argue before the trial court that Croxton’s failure to assess A.G.E.’s riding ability was a cause of the accident. Estes’s contention is that the defendants are not entitled to immunity under the Equine Act because the defendants
“made no attempt to assess what type of rider the minor child was, let alone whether she should have even been on the horse in the first place. Without the defendants fulfilling their obligations, i.e., inquiring to a rider’s ability and handling the horse in accordance with such abilities, the defendants are not entitled to the protection of the Act. See Willeck ex tel. Willeck v. Mrotek, Inc., 616 N.W.2d 526 (Wis.App.2000) (holding [Equine Activities Liability Act] immunity inapplicable because the sponsor did not find out rider’s actual ability before matching horse with rider).”
In support of this argument, Estes cites Willeck v. Mrotek, Inc., 235 Wis.2d 278, 616 N.W.2d 526 (Wis.Ct.App.2000)(table), an unpublished opinion of the Court of Appeals of Wisconsin applying a similar exception to an equine-immunity law. In that case, the Wisconsin court reversed a summary judgment in favor of an equine professional who had provided a horse to ah injured rider because there was no evidence indicating that the equine professional had affirmatively ascertained the injured rider’s general riding ability and the rider’s ability to ride the particular horse provided. The Wisconsin court did not address the issue of causation, and it appears to have applied the exception in a manner that would deny immunity whenever an assessment is not made, regardless of causation.
To the contrary, we find the Texas Supreme Court’s analysis regarding a substantially identical equine-immunity act in Loftin v. Lee, 341 S.W.3d 352 (Tex.2011), to be persuasive and more consistent with the legislative intent behind the Equine Act. In construing the Texas statute, the Texas Supreme Court analyzed the application of the exceptions to immunity and concluded that the exception similar to the exception at issue in this case required proof of causation to be established:
“[The statute creating the exception to immunity] does not expressly require the failure [to determine the ability of the rider] to have resulted in the injury. It can be read to say that a person who fails to make the prescribed determina *308 tion of a participant’s ability is liable for whatever injury befalls, even one a thorough investigation could not have avoided. So construed, [the statute creating the exception] would impose strict liability for an inadequate determination of a participant’s ability. But this is not a reasonable construction of the statute. For one thing, the express purpose of the Act is to limit liability, not create strict liability. For another, [the immunity statute] contains exceptions to [the] limitation on existing liability. Each of the other [exceptions] requires the specified misconduct to have caused the injury, thus leaving liability as if [immunity] did not exist. A provision creating strict liability for the first time cannot fairly be said to be an exception to a limitation on existing liability. Finally, the requirement of causation is strongly implied .... Accordingly, we hold that [the exception] applies only when the failure to make the required determination is itself the cause of the damage.”
Loftin, 341 S.W.3d at 359. See also Mays v. Valley View Ranch, Inc., 317 Ga.App. 143, 730 S.E.2d 592 (2012) (noting the breadth of the intended immunity under a similar act).
In the present case, the defendants made an evidentiary showing that they were entitled to the immunity afforded under the Equine Act. The burden shifted to Estes to show that genuine issues of material fact existed regarding the application of an exception to that immunity. The defendants established in their summary-judgment motion that the exception was not applicable to the facts. The evidence is undisputed that the injury to A.G.E. occurred as a result of the “propensity of an equine to behave in ways that may result in injury, harm, or death to persons on or around them” and because of the “unpredictability of the reaction of an equine to ... other animals.” § 6-5-337(b)(6)a and b. Estes presented no evidence to show that Croxton’s alleged failure to inquire into A.G.E.’s riding ability was a cause of the accident. Therefore, Estes failed to meet his burden of showing that a genuine issue of material fact existed with respect to the applicability of the immunity exception in § 6-5-337(c)(2)b.
Estes next contends that there were genuine issues of material fact concerning whether Croxton’s actions constituted wantonness.
“What constitutes wanton misconduct depends on the facts presented in each particular case. Central Alabama Electric Cooperative v. Tapley, 546 So.2d 371 (Ala.1989); Brown v. Turner, 497 So.2d 1119 (Ala.1986); Trahan v. Cook, 288 Ala. 704, 265 So.2d 125 (1972). A majority of this Court, in Lynn Strickland Sales & Service, Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142 (Ala.1987), emphasized that wantonness, which requires some degree of consciousness on the part of the defendant that injury is likely to result from his act or omission, is not to be confused with negligence (i.e., mere inadvertence):
“ Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury....
“‘Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as an act which cannot exist without a purpose or design, a con *309 scious or intentional act. “Simple negligence is the inadvertent omission of duty; and wanton or willful misconduct is characterized as such by the state of mind with which the act or omission is done or omitted.” McNeil v. Munson S.S. Lines, 184 Ala. 420, [428], 68 So. 992 (1913)....
[[Image here]]
“ ‘ “Willful and wanton conduct has a well-defined meaning at law. It is sometimes expressed in terms of ‘reckless disregard of the safety of another.’ Willful and wanton conduct should not be confused with negligence. It has been correctly stated that the two concepts are as ‘unmixable as oil and water.’ ”
[[Image here]]
Willfulness or wantonness imports premeditation, or knowledge and consciousness that the injury is likely to result from the act done or from the omission to act, and strictly speaking, is not within the meaning of the term ‘negligence,’ which conveys the idea of inadvertence, as distinguished from premeditation or formed intention.” ’
“510 So.2d at 145-46 (citations omitted). See also, Central Alabama Electric Cooperative v. Tapley, 546 So.2d 371 (Ala.1989).”
Ex parte Anderson, 682 So.2d 467, 470 (Ala.1996). In support of their summary-judgment motion, the defendants submitted Croxton’s deposition testimony, in which she stated that she had placed a hand on the child’s leg before the horse was startled and that her hand was pulled away when the horse began running. Although Estes claimed in his deposition testimony that Croxton’s hand pulled on A.G.E.’s leg, resulting in the fall, Estes’s own testimony indicates that he believed that Croxton was trying to get A.G.E. off of the horse and that he did not believe that she was purposefully trying to injure A.G.E. Estes produced no' evidence to show that Croxton had the requisite conscious mind-set needed to establish a showing of wantonness. Thus, the trial court appropriately determined that the § 6-5-337(c)(2)d exception to immunity was not applicable to the facts of this case.
Estes also contends that the defendants are not entitled to immunity under the Equine Act because they failed to provide sufficient warning as required by § 6-5-337(d). Specifically, Estes contends that the defendants never directed him to observe or read the sign at the stables at Stepping Stone’s facilities and that he was not required to sign a contract containing the requisite warning language. Estes’s claim that he did not see the sign does not defeat immunity. For immunity to attach, the Equine Act requires only that the equine-activity sponsor and the equine professional place the warning sign in “a clearly visible location on or near stables, corrals, or areas where the equine professional or the eqüine-activity sponsor conducts equine activities.” § 6-5-337(d)(l). The undisputed evidence reveals that the sign met the statutorily prescribed size criteria and was hanging on the stable in a visible location at Stepping Stone’s facilities on June 27, 2010. Estes does not claim that the defendants failed to position the sign in a “clearly visible location”; rather, he simply contends that he did not see the sign. Regardless of whether Estes noticed the sign and appreciated the warning, the undisputed evidence indicates that the defendants posted the warning in compliance with § 6-5-337(d) and are thus entitled to immunity' under the Equine Act.
Likewise, Estes’s contention that immunity is defeated because he did not *310 sign a written waiver form misapprehends the requirements of the Equine Act. Section 6-5-337(d) does not mandate that the defendants were required to provide Estes with a written contract containing the warning language; rather, that provision simply states that, in order for immunity to attach, every contract the defendants enter into relating to certain equine services must contain, in clearly readable print, the warning notice. Because there was no written contract between Estes and the defendants, the defendants were not required to provide him with a written waiver in order to maintain immunity under the Equine Act.
For the aforementioned reasons, we affirm the trial court’s summary judgment.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.

. In the caption of the complaint, Stepping Stone is identified as "Stepping Stone Stables”; however, in the body of the complaint, Estes refers to Stepping Stone as "Stepping Stone Farm.” Throughout the proceeding below, the parties interchangeably refer to the entity as "Stepping Stone Stables” and "Stepping Stone Farm." In their motion for a summary judgment, the defendants refer to the entity as "Stepping Stone Farm, LLC.” Our review of the record appears to indicate that "Stepping Stone Farm, LLC,” is the proper name of the entity, and we will use that name in this opinion.

. The term "equine” is defined to include "[a] horse [or] pony-” § 6-5-337(b)(2), Ala. Code 1975.